Kenneth W. MARTIN

v.

John P. MALHOYT, et al., Appellants

John Doe(s), et al.

Shirley Ann STEVENS

v.

David H. STOVER, et al., Appellants

John Doe, et al.

Nos. 86–5561, 86–5565.

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1987.

Decided Sept. 29, 1987.

Opinion On Denial of Rehearing Nov. 24, 1987.

Michael L. Martinez, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellants.

James L. Coffin, with whom Joseph P. Hart, Washington, D.C., was on the brief, for appellees.

Before GINSBURG and WILLIAMS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH B. GINSBURG.

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

RUTH BADER GINSBURG, Circuit Judge:

These consolidated appeals arise out of independent but, in legally relevant respects, similar episodes. Each began with U.S. Park Police officers investigating a minor traffic incident, escalated into a violent (or at least physical) encounter, and culminated in an arrest. Plaintiffs in the two cases—Kenneth Martin and Shirley Stevens—subsequently filed suit in the district court, seeking damages for alleged violations of their common law and constitutional rights. The defendant federal officers asserted immunity, by reason of their official positions, from all of the plaintiffs' claims, and moved for dismissal of the actions as to them. The district court denied their motions, and this appeal followed. We affirm in part and reverse in part. In explaining our dispositions, we grapple with unsettled aspects of the federal law governing official immunity.

## I. The Episodes in Suit

The congeries of facts that prompted these lawsuits, as the district judge observed, are sharply disputed. We set the opening scene in each case, then summarize separately each side's account of what occurred.

### A. Martin v. Malhoyt, No. 86–5561

Plaintiff Kenneth W. Martin worked as a chauffeur for a limousine tour service operating in Washington, D.C. On July 17, 1984, at about 12:35 p.m., he was seated behind the wheel of a Cadillac limousine parked near the Lincoln Memorial in a zone reserved for the disabled. From this point on, the parties' accounts diverge.[1]

### 1. Martin's account

According to Martin, a man in a United States Park Service uniform approached the limousine and asked Martin why he

---

1. Martin's account, as presented here, is taken from his Complaint, *Martin* (No. 85–2274) (July 16, 1985) (hereafter *Martin* Complaint), *reprinted in* Joint Appendix (J.A.) at 8–22, and his affidavit, November 7, 1985 Affidavit of Ken- neth W. Martin, *reprinted in* J.A. at 72–79. Malhoyt's account is taken from his affidavit, October 9, 1985 Affidavit of John P. Malhoyt, *reprinted in* J.A. at 66–71.

was parked in the disabled-only area. Martin replied that one of his passengers, a child, was having difficulty walking, whereupon the uniformed man departed. A few minutes later, a United States Park Police officer, later identified as Sergeant John P. Malhoyt, arrived at the spot. He too asked why Martin had parked in a restricted area. Martin repeated his explanation. Malhoyt said he would wait to see if Martin's story was true. Malhoyt then returned to his police vehicle and parked it in another space reserved for disabled persons, directly to the rear of Martin's limousine.

About ten minutes later, Martin noticed his passengers—a family of four (two young children and their parents)—descending the steps of the Lincoln Memorial. He drove slowly towards them. Malhoyt immediately pursued, emergency lights flashing and siren sounding. Martin promptly stopped. Malhoyt appeared at the driver's window of the limousine and demanded Martin's driver's license and vehicle registration. Martin started to get out of the car to conveniently remove from his pocket his wallet, which contained his license and the vehicle registration. Before Martin could retrieve his wallet, however, Malhoyt "brutally grabbed [Martin] around [the] waist, ... threw [him] back into [the] driver['s] seat," and slammed the car door on his leg.[2] Martin handed over his driver's license and the vehicle registration. Malhoyt thereupon returned to the police car, apparently to check the documents.

Just then, Martin saw his passengers approaching the limousine. Almost reflexively, he got out of the vehicle to open the door for them. Suddenly, without a word of instruction or command to Martin, Malhoyt reappeared at the limousine, pushed Martin against the vehicle, and twisted his arms behind his back. Malhoyt then handcuffed Martin and forced him into the police car, where Martin was obliged to sit, hands cuffed behind his back, for a prolonged period of time. An old shoulder injury made the awkward position severely painful for Martin, and he felt humiliated in front of his passengers and other onlookers.

After talking to the limousine passengers, Malhoyt drove Martin to the Park Police Station at 1100 Ohio Drive, S.W. Unable to say why he had made the arrest, Malhoyt asked Martin to sign a document and pay $10.00 to end the matter. Martin refused and was then fingerprinted and placed in a jail cell. Hours later, as Martin recalls, he was again put in a police car, hands cuffed behind his back, and was brought to the courthouse, but arrived there too late to obtain a hearing that day. On return to the Park Police Station, Malhoyt told Martin that this time, Martin would remain locked up overnight. Martin then called an attorney; on the attorney's advice, Martin posted $10.00 as collateral so that he could gain release. Martin estimates that he was released at about 5:00 p.m., approximately four hours after his arrest. Just as he was leaving the station, Martin states, Malhoyt informed him for the first time that he was being charged with disorderly conduct and disobeying the order of a police officer.

Two weeks later, on the date set for trial of the disorderly conduct charge, Martin and his attorney spent hours waiting in the District of Columbia Superior Court, but Martin's name was not called. Upon checking with the Office of the Corporation Counsel, Martin's attorney learned that the charge would be dismissed because no one from the Park Police had appeared to "paper" it. Trial on the charge of disobeying an officer's order was set for August 29, 1984; on August 28, however, Martin learned that this charge too would be dismissed for the same reason.

### 2. *Malhoyt's account*

According to Sergeant Malhoyt, at about 12:30 p.m. on the afternoon of July 17, 1984, Park Aide John R. Jones III summoned him to the Lincoln Memorial Circle to resolve a parking problem. On arrival, he saw Martin's Cadillac limousine parked in a space reserved for disabled persons; Jones informed Malhoyt that the limousine driver had twice refused to leave, and had dared Jones to call the police. When Malhoyt told Martin that the Cadillac was parked illegally, Martin responded that one of his passengers, a small child, was having difficulty walking. Jones, who was within earshot, and Martin began to argue, Jones claiming that Martin had said nothing to

---

**2.** Martin Affidavit at ¶ 17, *reprinted in* J.A. at 74.

him about a disabled passenger. Malhoyt stopped the argument by sending Jones away. Telling Martin he would wait to verify Martin's account, Malhoyt returned to his police cruiser and parked it behind the limousine.

A few minutes later, without warning, the limousine started south on French Drive *away from* the Lincoln Memorial. Because no passengers had approached the Cadillac and the driver was apparently leaving the Memorial, Malhoyt decided to ticket the driver for illegally parking in a disabled-only zone. Malhoyt switched on his emergency equipment as he pursued the limousine, which came to a stop 75 to 100 yards down French Drive. After Malhoyt asked Martin several times for his driver's license and registration, Martin opened the car door and got out. As Martin handed Malhoyt his license and registration, Malhoyt told Martin to get back in the car because Malhoyt thought this would be safer for Martin and oncoming traffic, as well as for Malhoyt himself if Martin proved dangerous. After Malhoyt repeated this instruction several times, Martin sat down in the car, leaving the door open and keeping his left foot on the street. Malhoyt, as he tells it, "lifted [Martin's] leg, plac[ed] it in the car[,] and closed the door." [3]

Back in his police cruiser, Malhoyt noticed some people approaching the Cadillac; surmising (correctly) that these were the limousine passengers, he left the cruiser to determine whether anyone in the group was walking with difficulty. Martin also left his vehicle and walked toward the passengers. Malhoyt then asked Martin to return to the limousine so that Malhoyt could speak to the passengers without Martin's interference. Martin refused, and became "increasingly argumentative, loud[,] and uncooperative." [4] "Concerned that th[e] situation was getting out of control," [5] Malhoyt arrested Martin for disorderly conduct.

At the Park Police Station, Malhoyt charged Martin with disorderly conduct and disobeying the order of a police officer. Malhoyt then explained Martin's options to him: Martin could post collateral (and either forfeit or demand a court date) or go directly to court. Malhoyt claims he processed the case as quickly as possible. He does not dispute that he arrived at court with Martin several minutes too late to afford Martin a hearing that day, but he asserts that Martin was released by mid-afternoon, immediately upon posting $10.00 as collateral, at about 3:30 p.m. Malhoyt further states that he asked another Park Police sergeant to have an officer from his squad "paper" Martin's case and that he provided that other sergeant with the necessary information and documentation. Malhoyt next heard of Martin, he avers, after the instant suit was filed.

## B. *Stevens v. Stover,* No. 86–5565

The events giving rise to this case began at about 11:30 p.m. on June 22, 1984. Plaintiff Shirley Ann Stevens, then a sergeant in the Metropolitan Police Department (MPD) but off-duty and out of uniform, was driving north on Pennsylvania Avenue, S.E. in Washington, D.C.; she encountered a traffic tie-up near Sousa Bridge caused by crowds departing from a concert in Fort Dupont Park. Again, the opposing sides account differently for the ensuing imbroglio.[6]

---

3. Malhoyt Affidavit at ¶ 8, *reprinted in* J.A. at 68.

4. *Id.* at ¶ 10, *reprinted in* J.A. at 69.

5. *Id.*

6. Stevens' account, as presented here, is taken from her Complaint, *Stevens* (No. 85–2035) (June 21, 1985) (hereafter *Stevens* Complaint),

reprinted in J.A. at 90–107, and her affidavit, October 16, 1985 Affidavit of Shirley Ann Stevens, *reprinted in* J.A. at 170–75. The Stover-Harasek account is taken from Stover's affidavit, October 15, 1985 Affidavit of David H. Stover, *reprinted in* J.A. at 163–69, and the notes of an MPD interview with Harasek, August 8, 1984 Interview Notes, Attachment B to Plaintiff's Ex-

### 1. *Stevens' account*

According to Stevens and the other two occupants of the car—Stevens' aunt, Mary Ella Stevens, and cousin, Johnny Bush, Jr.—Stevens sat patiently in the stalled traffic at a red light. She had imbibed only a small glass of wine that evening and was not intoxicated. Stevens heard car horns blaring but did not sound her own; she noticed an MPD officer apparently conversing with people in a car three or four car lengths ahead of hers. Stevens and her passengers state that this officer, whom the parties agree was MPD Officer McKinstry, did not speak to Stevens.

When the traffic light turned green and cars began to move, Stevens proceeded apace with the other vehicles towards Sousa Bridge. She then heard a siren, which she guessed was an emergency vehicle en route to an accident; as quickly as was possible in the heavy traffic, Stevens pulled to the right-hand curb. A car swerved to a stop in front of her, and a man dressed in blue jeans, a plaid shirt, and a painter's cap jumped out, sprinted to Stevens' car, and shouted, "You're locked up." [7] Reaching for her purse, Stevens tried to identify herself as a police officer, but the man opened her car door, dragged her out of the vehicle, and struck her in the face. He then handcuffed her, "brutally grinding her body and face onto the trunk of her ... vehicle," while "hysterically screaming" to a companion: "She's got a gun." [8] Her assailant's companion, Stevens remembers, stood by "with his hands in his pocket[s]," doing nothing to intervene.[9] Stevens did not in fact have a gun on her person or in her vehicle.

Stevens' assailant forced her into his car, throwing her on the back seat by her hair and arm, and dispersed all onlookers. After rolling up the car windows, he began punching Stevens in the chest and abdomen. She turned over to protect herself, but he continued to beat her. During this attack, the man said to Stevens, as she recalls his words: "You are one black bitch we don't have to worry about anymore, and ... guess what I am going to do for you. I'm going to charge you with assaulting a police officer." [10]

Stevens next remembers being placed on the cold metal of what she believes was a police van; she recalls little else until she awoke in severe pain on the floor of a cell. The cell was in the Anacostia Station of the United States Park Police, and the man who had arrested and battered her, she learned, was Park Police Sergeant David H. Stover (since promoted to lieutenant). Stover's companion at the Bridge, the man who had not come to Stevens' aid, was Park Police Officer John Harasek. Eventually, Stevens was moved to a holding cell at the District of Columbia Superior Court where U.S. Marshals informed her that she was charged with assaulting a police officer and driving while intoxicated (DWI).

After her release on bond, Stevens was treated at Providence Hospital for renal failure, which necessitated catheterization. She had also suffered a concussion and multiple contusions and abrasions on her face and body. Stevens spent eight days in the hospital. The concussion caused partial amnesia, and Stevens is undergoing psychiatric care as a result of the incident.

The DWI charge was dropped and, on April 10, 1985, after a grand jury refused to indict Stevens for assaulting a police officer, all charges were dismissed. Stevens was later discharged from the Metropolitan Police Department because of the events of June 22, 1984.

hibit 3, Plaintiff's October 16, 1985 Opposition to District Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, Record Entry (R.E.) 33, *Stevens* (No. 85–2035), *reprinted in* J.A. at 211–16.

7. Stevens Affidavit at ¶ 19, *reprinted in* J.A. at 172; *Stevens* Complaint at ¶¶ 25–26, *reprinted in* J.A. at 98.

8. *Stevens* Complaint at ¶¶ 28, 30, *reprinted in* J.A. at 99.

9. *Id.* at ¶ 30, *reprinted in* J.A. at 99.

10. Stevens Affidavit at ¶ 25, *reprinted in* J.A. at 173.

## 2. *Stover-Harasek account*

According to Stover and Harasek, on the evening of Stevens' arrest, the two Park Police officers, wearing plain clothes, were on duty in an unmarked cruiser; Stover was driving. At about 11:30 p.m., they were waiting on westbound Pennsylvania Avenue, S.E. at its intersection with Minnesota Avenue, S.E., while two uniformed MPD officers directed the dense traffic. When one of the officers, later identified as Officer McKinstry, held up the westbound traffic for an entire cycle of the traffic lights, a car horn began sounding. Stover and Harasek observed that the driver of the car to their right, later identified as plaintiff Shirley Stevens, was doing the honking.

McKinstry shouted a command telling the honker to stop, and Stevens paused. McKinstry held the traffic through another cycle of the lights, and Stevens began honking again. This time, McKinstry walked toward the cars, and Harasek indicated that Stevens was the source of the noise. McKinstry politely informed Stevens that using a horn in a non-emergency situation is punishable by a $25.00 fine. Stevens continued honking. McKinstry asked Stevens for her driver's license and vehicle registration. Just then, the light turned green. Stevens shouted, "Fuck you," and drove away, nearly hitting McKinstry.[11] Stover turned on his lights and siren and followed.[12]

Stover and Harasek say Stevens moved to the right but did not stop, even when Stover brought his car alongside hers and he and Harasek gestured for her to pull over. Stover finally forced Stevens to stop by cutting in front of her. He then ran back to her car and showed her his badge. Stevens screamed, "Who the fuck are you?" [13] Stover noticed that Stevens' eyes were watery, and he smelled alcohol.

After stating who he was and again displaying his badge, Stover asked Stevens whether she had heard the MPD officer request her license and registration. Stevens responded that she was an MPD sergeant herself and that Stover could not arrest her "for failure to exhibit." She reached for her purse. Stover ordered her not to touch it, but Stevens ignored him. Fearing that the purse contained a weapon, Stover grabbed it, and Stevens bit him on his right forearm, drawing blood. At this point, Harasek helped pull a struggling and cursing Stevens from the car. The officers brought Stevens to the rear of the car, and Stover announced that she was under arrest. Stevens flailed her arms, trying to prevent Stover and Harasek from handcuffing her. After a scuffle, they bent her over the trunk of the car and put on the cuffs.

Stover placed the still resisting Stevens in the back of his cruiser and sat down in front to use the radio. Stevens rocked onto her back and began kicking him in the head; next, she repeatedly attempted to escape by lifting the rear door lock with her teeth, twice managing to open the door.

Other officers arrived on the scene and Stevens was removed from the cruiser, placed in a police wagon, and transported to the Park Police Anacostia Station. There, Stevens refused to take a breath test for alcohol and continued to use abusive language; two officers at the station observed Stevens washing herself with water from the toilet in her cell. At her request, Stevens was taken by ambulance to D.C. General Hospital. Once there, however, she refused to identify herself or to allow doctors to treat her. She was returned to the police station and charged with assault on a police officer, DWI, and failure to exhibit her driving permit.

Stover further recounted that Stevens' two passengers, Johnny Bush and Mary

**11.** Stover Affidavit at ¶ 4, *reprinted in* J.A. at 164.

**12.** Officer McKinstry corroborates the Stover-Harasek version of these events. September 3,

1985 Affidavit of Christopher McKinstry ¶¶ 4–7, *reprinted in* J.A. at 184, 184–85.

**13.** Stover Affidavit at ¶ 7, *reprinted in* J.A. at 165.

Stevens, were interviewed on the night of the episode and appeared to be extremely intoxicated. Mary Stevens, according to Stover, admitted that all three had been drinking.

### 3. *Administrative proceedings against Stevens*

On August 25, 1985, the MPD gave Stevens notice that the Department proposed to remove her from the police force because of the arrest episode. Stevens requested review by an MPD Adverse Action Panel. A three-member panel, at a hearing which ran several days, received documentary and testimonial evidence. Stevens was represented by counsel. On May 22, 1986, the panel recommended Stevens' removal from the MPD.

Substantially crediting the Stover-Harasek account, the panel found that Stevens had in fact honked her horn unnecessarily, failed to display her driver's license and registration, refused to yield to Stover's police vehicle, resisted arrest, attempted escape, operated her car under the influence of alcohol, and used marijuana.[14] Further, the panel found that any injuries Stevens sustained were the result of her fighting with, and resisting arrest by, the Park Police.[15] On May 29, 1986, the MPD adopted the panel's decision,[16] and on June 20, Stevens was removed from the police force. Stevens appealed the MPD's decision to the Office of Employee Appeals, *see* D.C. CODE ANN. § 1–606.3 (1981); that appeal remains pending.

### II. THE DISTRICT COURT PROCEEDINGS

Martin filed suit in the district court on July 16, 1985 against, *inter alia*, Malhoyt and Lynn H. Herring, Chief of the United States Park Police. Stevens commenced her action in the district court on June 21, 1985 against, *inter alia*, Stover, Harasek, and Herring. All four were sued in their individual and official capacities. Martin and Stevens named numerous other defendants who are not parties to this appeal.[17]

The complaints charged that the defendants had violated Martin's and Stevens' constitutional rights, including the fourth amendment right to be free of unreasonable seizures, the fifth amendment right not to be deprived of liberty or property without due process of law, and the sixth amendment right to be informed of the nature and cause of criminal accusations. Stevens also alleged that Stover, Harasek, and McKinstry, as part of a conspiracy to violate Stevens' constitutional rights, and in contravention of 42 U.S.C. § 1985, had made statements calculated to secure Stevens' criminal prosecution. Both plaintiffs claimed, "[o]n information and belief," that it is a practice of the United States Park Police to arrest and assault people who have committed no offense and to charge them with disorderly conduct, disobeying a police officer, or assaulting a police officer. These charges, according to plaintiffs, are usually dismissed before trial.[18]

In addition to alleging claims of constitutional dimension, the two complaints also allege common law claims for assault, bat-

---

**14.** Findings, Conclusions and Recommendation of Adverse Action Panel of Metropolitan Police Department at 69–72, Exhibit 1, Federal Defendants' January 8, 1987 Motion for Reconsideration or for Summary Judgment, R.E. 84, *Stevens* (No. 85–2035).

**15.** *Id.* at 51.

**16.** Final Notice of Adverse Action, Exhibit 1, Federal Defendants' January 8, 1987 Motion for Reconsideration or for Summary Judgment, R.E. 84, *Stevens* (No. 85–2035).

**17.** Categories of defendants named in the complaints but not involved in these consolidated

appeals include: several high-ranking federal officials and the United States; unknown police officers, styled John and Jane Doe (not further identified before the district court), who allegedly assisted Malhoyt in arresting Martin, and Stover and Harasek in arresting Stevens; in Stevens' complaint only, several District of Columbia officials and police officers and the District itself.

**18.** *Martin* Complaint at ¶¶ 47–48, *reprinted in* J.A. at 8, 19–20; *Stevens* Complaint at ¶¶ 56–57, *reprinted in* J.A. at 103–04.

tery, false arrest and imprisonment, malicious prosecution, intentional and negligent infliction of emotional distress, negligence, and gross negligence. Martin included a defamation claim. Stevens, in a particularized separate count, charged appellant Harasek with breaching his "affirmative duty to intervene and prevent Defendant Stover from unlawfully arresting and assaulting Plaintiff." [19] Martin and Stevens requested compensatory and punitive damages as well as declaratory and injunctive relief. The two cases were assigned to the same district judge.

In both cases, the appellants now before us—Malhoyt and Herring in *Martin;* Stover, Harasek, and Herring in *Stevens* —moved for dismissal under Rule 12(b)(6) (failure to state a claim upon which relief can be granted) or for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. On July 9, 1986 in *Martin,* and on July 15, 1986 in *Stevens,* the district court filed opinions and orders denying these motions in substantial part.

In support of their dispositive motions, all four appellants first argued, citing *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), that they have absolute immunity from liability on appellees'

common law tort claims. The district court rejected this plea as to Malhoyt, Stover, and Harasek on the ground that absolute immunity shelters only "discretionary" acts, not "ministerial" conduct. Featuring *Carter v. Carlson,* 447 F.2d 358 (D.C.Cir. 1971), *rev'd on other grounds sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the court ruled that arrests by police officers qualify as ministerial acts for the purpose at hand, and therefore are not shielded by *Barr* immunity.[20] The district court, however, did dismiss on immunity grounds pleas against Park Police Chief Herring insofar as they involved allegedly negligent training; deciding what to cover in training, the district court said, is a "discretionary" act, indeed, it involves "the essence of policy formulation." [21]

As to the alleged constitutional torts, appellants claimed qualified immunity, citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The district court recited the *Harlow* standard: qualified immunity shields government officials as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102

19. *Id.* at ¶ 68, *reprinted in* J.A. at 106. The coupling of constitutional and common law claims, we note, occurs regularly in cases of this genre. *See, e.g., Martin v. D.C. Metropolitan Police Dep't,* 812 F.2d 1425 (D.C.Cir.1987).

20. *Martin* Opinion at 5–6, *reprinted in* J.A. at 34–35; *Stevens* Opinion at 7, *reprinted in* J.A. at 122.

   The finality of the district court's disposition of the Malhoyt, Stover, and Harasek absolute immunity pleas with respect to the common law claims is not entirely clear. The court stated in *Stevens* that, because "arrests are ministerial acts, the defendants are not eligible for absolute immunity for common law torts committed when making arrests." *Stevens* Opinion at 7, *reprinted in* J.A. at 122; *accord Martin* Opinion at 6, *reprinted in* J.A. at 35. In each case, however, in subsequent, nearly identical orders, the district court described its earlier decision as follows: "the Court denied, *without* prejudice, defendants' motion to dismiss based on claims of absolute ... immunity." Martin v. Malhoyt, No. 85–2274 (D.D.C. Aug. 26, 1986)

(order denying protective order and granting stay of trial) (hereafter *Martin* Aug. 26, 1986 Order) (emphasis supplied), *reprinted in* J.A. at 49; Stevens v. Stover, No. 85–2035 (D.D.C. Aug. 26, 1986) (order denying protective order and granting stay of trial) (hereafter *Stevens* Aug. 26, 1986 Order) (emphasis supplied), *reprinted in* J.A. at 139. In addition, shortly after the filing of these orders, the district court issued a "Notice to Counsel" in each case implying that the absolute immunity question could not yet be finally determined because the facts on which immunity turned were in dispute. Martin v. Malhoyt, No. 85–2274 (D.D.C. Aug. 28, 1986) (Notice to Counsel distinguishing D.C. Circuit cases) (*Martin* Notice to Counsel), *reprinted in* J.A. at 53; Stevens v. Stover, No. 85–2035 (D.D.C. Aug. 28, 1986) (Notice to Counsel distinguishing D.C. Circuit cases) (*Stevens* Notice to Counsel), *reprinted in* J.A. at 143.

21. *Martin* Opinion at 10–12, *reprinted in* J.A. at 39–41; *Stevens* Opinion at 11–12, *reprinted in* J.A. at 126–27.

S.Ct. at 2738. The law was clear, the district judge observed, on the necessity of probable cause for an arrest, the impermissibility of excessive force in making an arrest, and the elements of the offenses for which the arrests had been made. Because the facts relevant to the probable cause determination were sharply disputed, however, the district judge stated that he could not determine whether Malhoyt, Stover, and Harasek had violated clearly established legal rules concerning arrests until further discovery had taken place. Similarly, the court stated that further discovery was in order before it could resolve the question of Park Police Chief Herring's immunity from suit on the charge of maintaining a policy of arresting absent probable cause, and later dropping the charges.[22] With respect to the constitutional tort claims, the court therefore denied without prejudice appellants' Rule 12(b)(6) and Rule 56 motions.[23]

Malhoyt, Stover, Harasek, and Herring filed appeals from the district court's denials of their immunity-based dismissal motions.[24] The appeals were consolidated. Pending appeal, appellants moved in the district court, under Rule 26(c) of the Federal Rules of Civil Procedure, for protective orders halting discovery, and for stays of all district court proceedings. The court refused to postpone discovery, but stayed trial pending appeal.[25]

On January 8, 1987, appellants Malhoyt and Herring in *Martin* and Stover, Harasek, and Herring in *Stevens* moved for reconsideration in the district court in light of several cases decided by this court in December 1986 dealing with qualified immunity and the specificity of pleading necessary to withstand a motion to dismiss. *See Ellsberg v. Mitchell,* 807 F.2d 204 (D.C. Cir.1986); *Smith v. Nixon,* 807 F.2d 197 (D.C.Cir.1986); *Halperin v. Kissinger,* 807 F.2d 180 (D.C.Cir.1986). The *Stevens* appellants, citing *University of Tennessee v. Elliott,* — U.S. —, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), also argued in their motion for reconsideration that Stevens was precluded from relitigating issues of fact resolved by the Adverse Action Panel.[26] The district court denied the motion to reconsider on March 17, 1987 in *Martin* and on April 7, 1987 in *Stevens.*[27]

## III. OFFICIAL IMMUNITY

To determine whether the district court erred in refusing to enter summary judgment on the defendants' pleas of official immunity from the claims asserted by Mar-

---

**22.** *Martin* Opinion at 14–16, *reprinted in* J.A. at 43–45; *Stevens* Opinion at 13–14, *reprinted in* J.A. at 128–29.

**23.** *Martin* Opinion at 6–9, *reprinted in* J.A. at 35–38; *Stevens* Opinion at 8–9, *reprinted in* J.A. at 123–24.

As to the 42 U.S.C. § 1985 conspiracy count in *Stevens,* the court allowed the claim to remain in the case against Stover and Harasek, but dismissed it as bereft of support regarding Herring. *Stevens* Opinion at 14–15, *reprinted in* J.A. at 129–30.

**24.** Denial of a claim of absolute immunity is immediately appealable under the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). *See Nixon v. Fitzgerald,* 457 U.S. 731, 742–43, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982). Denial of a qualified immunity claim is similarly appealable at once. *Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2815–17, 86 L.Ed.2d 411 (1985).

**25.** *Martin* Aug. 26, 1987 Order, *reprinted in* J.A. at 49; *Stevens* Aug. 26, 1986 Order, *reprinted in* J.A. at 139.

**26.** When the district court issued its July 15, 1986 decision in *Stevens,* both the court and counsel for defendants were apparently unaware of the Adverse Action Panel's May 22, 1986 decision. *See Stevens* Opinion at 2–6, *reprinted in* J.A. at 117–21; Federal Defendants' January 8, 1987 Memorandum of Law in Support of Their Motion for Reconsideration or for Summary Judgment at 3 & n. 2, R.E. 84, *Stevens* (No. 85–2035).

**27.** *Martin v. Malhoyt,* No. 85–2274 (D.D.C. Mar. 17, 1987) (opinion and order denying motion for reconsideration); *Stevens v. Stover,* No. 85–2035 (D.D.C. Apr. 7, 1987) (order denying motion for reconsideration).

tin and Stevens, we must first pursue a threshold inquiry: What are the contours of the immunity to which the defendants are entitled? As to the alleged constitutional violations, the parties agree that the defendants can assert a "qualified immunity" from suit; their disagreement centers on the application of that standard to the plaintiffs' allegations, a question we address in Section IV. Officers Malhoyt, Stover and Harasek additionally contend that, by virtue of the "absolute immunity" rule established in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), they are totally immune from suit on the common law claims facing them. We reject the pleas of total immunity, and hold that these officers have, instead, a "qualified immunity" from liability on the common law claims alleged in the Martin and Stevens complaints. Because the law in this area is unsettled—still evolving and variously interpreted—we spell out our reasoning in some detail. We note that guidance from Higher Authority may soon be available to us and our sister courts, for the Supreme Court has undertaken to address the question of *Barr's* reach. *See Erwin v. Westfall*, 785 F.2d 1551 (11th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 1346, 94 L.Ed.2d 517 (1987); Brief for the Petitioners at 8, *Westfall v. Erwin* (No. 86–714) (Solicitor General argues that "federal employees acting within the scope of their employment—and most clearly those exercising a modicum of discretion—are entitled to [absolute] immunity from state law tort suits.").

**A. Barr** *and the Doctrine of "Absolute Immunity" for Federal Officials*

■ In *Barr,* the Supreme Court. held that the Acting Director of the Office of Rent Stabilization, a federal agency, was immune from a libel suit arising out of actions taken "within the outer perimeter of [his] line of duty." 360 U.S. at 575, 79

S.Ct. at 1341; *see also Howard v. Lyons,* 360 U.S. 593, 597, 79 S.Ct. 1331, 1333, 3 L.Ed.2d 1454 (1959) (scope of immunity afforded federal employees is a matter of federal law "to be formulated by the courts in the absence of legislative action by Congress"). The precise reach of the *Barr* holding as to other tortious acts and less elevated federal employees was not settled by the Court's decision; in sustaining Barr's immunity claim, Justice Black, whose vote was necessary to form a majority, stressed the importance of "informed public opinion" to the "effective functioning of a free government." *Barr,* 360 U.S. at 577, 79 S.Ct. at 1342 (Black, J., concurring); *see also id.* ("[I]f federal employees are to be subjected to ... restraint in reporting their views about how to run the government better, the restraint will have to be imposed expressly by Congress and not by the general libel laws of the States[.]").[28]

Uncertainty as to the bounds, and even the endurance, of *Barr* developed in the years following announcement of the decision. As we recently observed:

In a series of mid 1970's decisions, the Supreme Court generally rejected *state* officials' pleas of absolute immunity from civil liability for torts committed in alleged violation of a plaintiff's *constitutional* rights. *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This series of decisions fueled debate earlier generated in commentary over the soundness, breadth, and continued vitality of *Barr. See, e.g., Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution,* 566 F.2d 289, 303 (D.C.Cir. 1977) (en banc) (Wilkey, J., concurring), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

---

**28.** Justice Black's concurring opinion provides the "narrowest grounds" for the Court's disposition of the case and thus constitutes the Court's holding. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

*McKinney v. Whitfield*, 736 F.2d 766, 768 (D.C.Cir.1984).[29]

Doubts about *Barr*'s continuing vitality, however, were dispelled in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed. 2d 895 (1978). *Butz* was an action for damages against Agriculture Department officials alleged to have violated plaintiff's *constitutional* rights; the Court assumed *Barr*'s continuing sway, while holding that it "does not control this case." *Id.* at 489, 98 S.Ct. at 2902. The *Butz* Court distinguished *Barr* on the ground that *Barr* "did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution." *Id.* at 495, 98 S.Ct. at 2905; *see also id.* ("The liability of officials who have exceeded *constitutional* limits was not confronted in ... *Barr* [.]") (emphasis added).

While assuming the endurance of *Barr*, the *Butz* Court rejected the attempt to *extend Barr* beyond "state tort claims," *id.*, into the realm of "constitutional torts." *Butz* thus confined, but did not precisely define, *Barr*'s scope, for the Court left unresolved the extent to which *Barr*-style immunity adheres to *all non*-constitutional claims against federal employees. *See id.* (*"Whatever level of protection from state interference* is appropriate for federal officials *executing their duties under federal law*, it cannot be doubted that these officials ... are subject to the restraints imposed by the Federal Constitution.") (emphasis added); *cf. United States v. Brewster*, 408 U.S. 501, 513–15, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972) (statement in prior case that immunity under Speech or Debate Clause does not attach to actions "in no wise related to the due functioning of the legislative process" does not "imply

as a corollary" that all actions related to the legislative process *are* immune). It remains to be determined by the Supreme Court both (1) the character of claims—all or only some common law torts—within *Barr*, and (2) the universe of federal employees covered by the absolute immunity shield.

Lacking further instruction from the Supreme Court, some lower federal courts have moved toward adoption of this dichotomy: "qualified immunity" under *Butz* when a federal official is charged with a constitutional tort; "absolute immunity" under *Barr* when the charge is a common law tort. *See, e.g., Martin v. D.C. Metropolitan Police Dep't*, 812 F.2d 1425, 1428 n. 11 (D.C.Cir.1987) (courts have "extended the absolute immunity defense to 'executive officials at all levels' of the federal hierarchy [and] to a full range of common law delicts"), quoting *McKinney*, 736 F.2d at 769. *See generally* 5 DAVIS, ADMINISTRATIVE LAW TREATISE 112–21 (2d ed. 1984) (commenting critically on the position emerging in the wake of *Butz* that "absolute immunity" goes with common law tort claims, "qualified immunity" with constitutional tort claims).[30]

But acceptance of this bipartite scheme is not universal, and diversity among federal courts remains marked, particularly as to the categories of employees sheltered by *Barr*. While two courts of appeals have indicated that *Barr*'s absolute immunity from common law tort liability extends to all federal employees, regardless of their duties or place in the federal hierarchy, *see General Electric Co. v. United States*, 813 F.2d 1273, 1276–77 (4th Cir.1987); *Poolman v. Nelson*, 802 F.2d 304, 307 (8th Cir.1986), other courts have limited *Barr* to employees at the policymaking or planning

**29.** Much of the uncertainty stemmed from attempts to integrate or reconcile *Barr*'s official immunity concept with more expansive notions of the federal courts' jurisdiction to entertain claims against local and federal officials based on alleged constitutional violations. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Bivens v. Six Unknown Named*

*Agents of the FBI*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**30.** As we noted elsewhere, this bipartite scheme inferred from the *Butz* opinion has "not been universally well-received." *See Martin v. D.C. Metropolitan Police Dep't*, 812 F.2d 1425, 1428 n. 11 (D.C.Cir.1987), and authorities cited therein.

level, as distinguished from employees working at the operational level who function day to day under established procedures and guidelines. *See Heathcoat v. Potts,* 790 F.2d 1540, 1542 (11th Cir.1986); *Araujo v. Welch,* 742 F.2d 802, 804 (3d Cir.1984); *Jackson v. Kelly,* 557 F.2d 735, 737–38 (10th Cir.1977) (en banc); *see also Harlow v. Fitzgerald,* 457 U.S. at 807–808, 102 S.Ct. at 2732–33 (*Barr* applies to "high" government officials). Still other courts stand someplace in between, applying *Barr* to officers exercising even limited discretion. *See Granger v. Marek,* 583 F.2d 781 (6th Cir.1978); *Green v. James,* 473 F.2d 660 (9th Cir.1973).

Of particular relevance to the claims before us, the Supreme Court has never held or even hinted that federal law enforcement officers enjoy absolute immunity for wrongful conduct—however characterized (constitutional or common law tort)—engaged in during an arrest. *See Doe v. McMillan,* 412 U.S. 306, 319, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973) ("*Barr* ... made it clear that the immunity conferred might not be the same for all officials for all purposes.... Judges, like executive officers with discretionary functions, have been held absolutely immune.... But policemen and like officials apparently enjoy a more limited privilege."); *cf. Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) (observing in *dictim* that "[t]he common law has never granted police officers an absolute and unqualified immunity").[31] We therefore resist taking either a mechanistic approach (as *Butz* attends constitutional tort claims so *Barr* attends common law tort claims), or one not suggested by the Supreme Court (holding police officers absolutely immune) to the tort liability of the officers before us in these consolidated actions. Instead, we have freshly and closely examined the *Barr* and *Butz* opinions; based on that examination, we decline to extend "absolute immunity" to the Park Police misconduct claims *sub judice* in these cases.

Three interlocking and mutually reinforcing goals figured prominently in *Barr.* The first is implicated whenever courts confront damage actions against government officials: "[O]fficials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect to acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr,* 360 U.S. at 571, 79 S.Ct. at 1339. Second was a perceived need to exempt government officials from the burden of explain-

---

**31.** Prior to the differentiation of constitutional and common law torts in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), lower federal courts were divided over the immunity of federal law enforcement officers from common law tort claims. In *Dellums v. Powell,* 566 F.2d 167, 175–76 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), we granted the Chief of the United States Capitol Police a "reasonableness" defense, akin to qualified immunity, to common law false arrest and imprisonment claims, relying upon District of Columbia law. *But see Galella v. Onassis,* 487 F.2d 986, 993–94 (2d Cir.1973) (United States Secret Service agents carrying out special statutory duty shielded by absolute immunity from common law false arrest liability, though "[o]rdinarily enforcement agents charged with the duty of arrest are not so immune"); *Norton v. McShane,* 332 F.2d 855, 857–62 (5th Cir.1964) (Deputy United States Marshal absolutely immune from common law

liability for malicious arrest and detention without probable cause).

*Butz,* the defendants here argue, implicitly overturned our *Dellums* holding. We have not, until today, revisited this question, and other courts have divided on its resolution. *See, e.g., Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983) (holding, without discussion, that federal Drug Enforcement Administration agents are absolutely immune from common law tort liability arising out of search and arrest); *Sanders v. Nunley,* 634 F.Supp. 474 (N.D.Ga.1985) (Navy Exchange detective absolutely immune from liability for false arrest and imprisonment based on detention of suspected shoplifter); *Kroll v. United States Capitol Police,* 590 F.Supp. 1282, 1293–95 (D.D.C.1983) (United States Capitol Police officer entitled to good faith and reasonableness immunity defense to liability for false arrest and imprisonment; common law and constitutional claims not treated separately).

ing and justifying their subjective motives for choosing a particular course of action. *See id.* at 575, 79 S.Ct. at 1341 ("The fact that the action here was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, *despite the allegations of malice in the complaint* [.]") (emphasis added); *id.* at 571, 79 S.Ct. at 1339 ("Again and again the public interest calls for action which may turn out to be founded on a mistake, on the face of which an official may later find himself hard put to satisfy a jury of his good faith"; public officials who have been "honestly mistaken" should not be exposed to suit.), quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949); *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896) (federal officers should not be "under an apprehension that the motives that control [their] official conduct may, at any time, become the subject of inquiry in a civil suit for damages").

These two concerns, we stress, in the years since *Barr,* have been fully incorporated into the federal qualified immunity doctrine.[32] However, a third, and perhaps less obvious, concern animated the *Barr* Court, one which is of particular significance where, as here, state law claims are asserted against federal officers. As the Court commented in *Butz,* "*Barr* did not ... purport to depart from the general rule, which long prevailed, that a federal official may not with impunity ignore the limitations which *the controlling law* has placed on his powers." *Butz,* 438 U.S. at 489, 98 S.Ct. at 2902 (emphasis added); *see also id.* at 495, 98 S.Ct. at 2905 ("[N]either [*Barr* nor *Spalding v. Vilas,* 161 U.S. 483,

16 S.Ct. 631, 40 L.Ed. 780 (1896), a case heavily relied upon in *Barr*] purported to abolish the liability of federal officers for action *manifestly beyond their line of duty* [.]") (emphasis added); *Barr,* 360 U.S. at 573–74, 79 S.Ct. at 1340–41 ("It is ... the duties with which the particular officer ... is enstrusted—the relation of the act complained of to 'matters *committed by law* to his control or supervision'—which must provide the guide in delineating the scope of the rule which clothes the official act of the executive officer with immunity[.]"), quoting *Spalding,* 161 U.S. at 498, 16 S.Ct. at 637 (emphasis added).

The "general rule" to which the *Butz* Court referred can be harmonized with the blanket immunity *Barr* granted by recognizing this key point: *state law* normally does not establish the scope of a *federal* officer's "line of duty" or the matters "committed by law to his control or supervision." Viewed in this light, federal supremacy concerns appear central to the continuing vitality of *Barr*-style absolute immunity; in the words of the *Butz* Court again, the "immunity of federal executive officials began as a means of protecting them in the execution of their *federal statutory duties* from criminal or civil actions based on *state law.*" *Butz,* 438 U.S. at 489, 98 S.Ct. at 2902 (emphasis added), citing *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 865–66, 6 L.Ed. 204 (1824) (exempting "the trade of the [federal] bank, ... necessary to the fiscal operations of the [federal] government, from the control of the states"). In sum, for the federal official, the law "controlling ... his powers," *Butz,* 438 U.S. at

---

**32.** As to the need to protect federal officials' freedom of action from the "fear of damage suits," *see, e.g., Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736 (the "social costs" minimized by the qualified immunity rule include "the expenses of litigation, the diversion of official energy from pressing public issues, ... the deterrence of able citizens from acceptance of public office [, and] the danger that fear of being sued will 'dampen the ardor of all but the most resolute'," quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949); qualified immunity represents "the

best attainable accommodation of competing values"); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ("As the qualified immunity has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

Similarly, the reformulated qualified immunity doctrine protects officials against wide-ranging and potentially disruptive inquiries into their subjective motives. *See Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–38.

489, 98 S.Ct. at 2902, generally is *federal* (whether constitutional, statutory or common law in character); were it otherwise, the states would be "capable of arresting all the measures of the [federal] government, and of prostrating it at the foot of the states." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 432 (1819).

The official immunity doctrine thus ensures that "if [the federal officer's] acts were *authorized by controlling federal law," Butz,* 438 U.S. at 490, 98 S.Ct. at 2902 (emphasis added), the officer "[will be] protected for action tortious under state law." *Id.* On the other hand, where the official "failed to observe obvious [federal] statutory or constitutional limitations on his powers," *id.* at 494, 98 S.Ct. at 2904, liability could be imposed. This "protection from state interference," *Butz,* 438 U.S. at 495, 98 S.Ct. at 2905, we conclude, is a mainstay of the *Barr* "absolute immunity" doctrine, as revisited in *Butz.*[33]

Against this background of concern for protecting federal officers, acting under color of federal law, from diverse, even possibly hostile, state law rules, the Park Police officers' absolute immunity pleas in the cases before us are particularly vulner-able. Park Police officers are statutorily authorized to "make arrests without warrant for any offense against the United States committed in [their] presence," 16 U.S.C. § 1a–6(a)(1); *see also id.* at § 1a–6(c) (authorizing Park Police officers to "conduct investigations of offenses against the United States"); their authority to enforce federal law, however, is expressly augmented by the Secretary of the Interior's authority to "cooperate, within the National Park System, with any State ... in the enforcement or supervision of the laws or ordinances of that State." *Id.* § 1a–6(b)(2). Pursuant to that latter authority, Park Police officers may enforce District of Columbia law within all National Parks in the District of Columbia. 36 C.F.R. § 50.3(a) (1986).[34] Additionally *and uniquely,* the District of Columbia authorizes Park Police officers *operating anywhere in the District* to "perform the same powers and duties as the Metropolitan police of the District." D.C. CODE ANN. § 4–201 (1981).[35]

In short, Park Police officers are permitted to act, in all respects, as District of Columbia police officers both on and off National Parks territory, and it was in their District of Columbia law enforcement capacity that Officers Malhoyt, Stover, and

**33.** The federal supremacy concerns stressed in the text should not be confused with the "functional analysis" required by another use of the "absolute immunity" doctrine wherein "the especially sensitive duties of certain officials—notably judges and prosecutors—require[ ] the continued recognition of absolute immunity." *Nixon v. Fitzgerald,* 457 U.S. 731, 746, 102 S.Ct. 2690, 2699, 73 L.Ed.2d 349 (1982); *see Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity for prosecutors); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (judicial absolute immunity). The defendants in the instant case press no claim that they are entitled to such judicial or "quasi-judicial" immunity.

**34.** In addition, pursuant to 36 C.F.R. §§ 50.1 and 50.3(b), the laws of Maryland and Virginia "shall be invoked and enforced" by Park Police officers in "all park areas administered by National Capital Parks, National Park Service" within those states. *See also* 18 U.S.C. § 13 (Persons committing, on United States property, "any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State ... in which such [property] is situated, by the laws thereof in force at the time ... shall be guilty of a like offense and subject to a like punishment.").

**35.** The authority of Park Police officers to enforce local law in Maryland and Virginia is more restricted. *See* MD.ANN CODE Art. 27 § 594B(h)(1) (Supp.1986) (granting federal law enforcement officers the power to make arrests only when "rendering assistance to a [local] police officer ..., at the request of the [local] police officer or in an emergency"); VA.CODE ANN. § 15.1–131.4 (1981) (permitting counties to "enter into an agreement with the United States government ... under the terms of which agreement law-enforcement officers employed by such government, including but not limited to members of the United States Park Police, may enforce the law of such county and [Virginia] on federally owned properties within such county, and on the highways and other public places abutting such properties").

Harasek took the actions complained of here.[36] It therefore cannot be maintained that local law was in no sense "controlling" in defining the "line of duty" of the Park Police officers in the episodes in suit. Local "interference" with the implementation of federal law and policy is not the overriding concern where the powers of federal officers have been augmented, with the express approval of both federal and state legislative authorities, to include the power to enforce local law, and where local law enforcement is at issue in the case. This point is all the more telling where the local law in question is that of the District of Columbia. As we have observed in another context, "[v]iolations of the District of Columbia Code and violations of the United States Code are crimes against a single sovereign, namely, the United States." *Goode v. Markley*, 603 F.2d 973, 976 (D.C. Cir.1979).

We thus hold that the principle of *Barr v. Matteo*, as described in *Butz v. Economou*, is inapplicable to these cases, and that the officer defendants are not "absolutely immune" from liability for their allegedly tortious conduct in effecting the plaintiffs' arrests. We hold further, however, that the defendants are entitled to raise the federal "qualified immunity" plea, as developed in *Harlow* and progeny,[37] wherein they are "shield[ed] ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, —— U.S. ——, ——, 107 S.Ct. 3034, 3037–

40, 97 L.Ed.2d 523 (1987); *see infra* Section III.B.

Doctrinal symmetry might seem to require according these officers, acting as they were to enforce local law, only whatever immunity local law might provide similarly situated local law enforcement personnel. Such a resolution, however, would ignore other, plainly federal interests at stake here, interests distinct from the interest in the unfettered enforcement of federal law referred to above. *See Howard v. Lyons*, 360 U.S. at 597, 79 S.Ct. at 1333 (immunity afforded federal officials presents a federal question; governing rules are "designed to promote the effective functioning of the Federal Government"). Park Police officers, no less than federal executive officers generally, must often "act swiftly and on the basis of factual information supplied by others, [occasionally in an] 'atmosphere of confusion, ambiguity, and swiftly moving events'," *Butz*, 438 U.S. at 497, 98 S.Ct. at 2906, quoting *Scheuer*, 416 U.S. at 246–47, 94 S.Ct. at 1691, which may often carry them across local political boundaries in the exercise of their duties.[38] If the purpose of an immunity rule is to "provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages,'" *Anderson*, —— U.S. at ——, 107 S.Ct. at 3042, quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984), that purpose would be "utterly defeated if officials were unable to determine whether they were protected by the [immunity] rule without entangling themselves in the vagaries of the ... American common law."

---

**36.** Martin's arrest took place in the vicinity of the Lincoln Memorial; it is not settled whether Martin was, or was not, on National Park Service property at the time of his arrest. Stevens' arrest, on the other hand, unquestionably did not take place on federal land. Under the statutes and regulations cited in the text, however, *see supra* text at notes 34–35, the distinction between federal and non-federal property does not limit the scope of the Park Police officers' authority to act within the District of Columbia. Officers of the D.C. Metropolitan Police Department, it is critical and clear, could have made the arrests at issue in both cases.

**37.** *See, e.g., Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

**38.** We note, for example, that the Lincoln Memorial, site of the Martin-Malhoyt encounter, is a stone's throw across the Potomac River from Virginia, while the Sousa Bridge, which Stevens was approaching, is only a few miles from the Maryland state line.

*Anderson,* —— U.S. at ——, 107 S.Ct. at 3042; *cf. id.* at ——, 107 S.Ct. at 3040–41 ("An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials the assurance of protection that it is the object of the doctrine to provide.").

A uniform federal qualified immunity standard will avoid "Balkaniz[ation]," *id.* at ——, 107 S.Ct. at 3042, of the immunity doctrine, while providing federal police officers with adequate protection that "they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.* at ——, 107 S.Ct. at 3042; *see also Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").[39] In the following section, we examine salient characteristics of the federal "qualified immunity" standard before turning to its application to the cases before us.

### B. *The Scope of Defendants' Qualified Immunity*

■ In the leading case of *Harlow v. Fitzgerald,* the Supreme Court defined the qualified immunity standard in these terms: "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. More recently, the Court noted a potential troub-

lespot in judicial endeavors to apply the *Harlow* formulation:

The operation of [the *Harlow*] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow. . . .*

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson,* —— U.S. at ——, 107 S.Ct. at 3038; *see also id.* (in case alleging unlawful search, the "relevant question" is whether a reasonable officer would have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed"). A motion for summary judgment on the issue of the defendant's qualified immunity thus must be denied where, viewing the facts in the record and all reason-

---

**39.** An additional consideration supports our disposition of this issue. Under the prevailing law in the states, police officers are not accorded absolute immunity from suit for false arrest, false imprisonment, or assault and battery committed during the course of an arrest. *See Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) ("The common law has never granted police officers an absolute and unqualified immunity[.]"); *Carter v. Carlson,* 447 F.2d 358, 362–63 & n. 9 (D.C.Cir.1971)

(under common law principles, arresting officers have "no immunity from suit for torts committed in the course of making an arrest" although a "good faith" defense is available). We are reluctant to extend to the officers before us a shield that common law jurisprudence has not found it necessary or proper to provide; and as we earlier observed, *see supra* p. 248, the Supreme Court has never put together *Barr* and police officer misconduct.

able inferences derived therefrom in a light most favorable to the plaintiff, a reasonable jury could conclude that the unlawfulness of defendant's action was so "apparent," *id.*, that no reasonable officer could have believed in the lawfulness of his actions.

Consistent with the *Anderson v. Creighton* Court's emphasis on the "particularized" manner in which the immunity inquiry is to be undertaken, we "subject damage actions against government officials to a heightened pleading standard," *Smith v. Nixon*, 807 F.2d 197, 200 (D.C.Cir.1986),[40] wherein plaintiffs must, at the very least,[41] specify the "clearly established" rights they allege to have been violated with "sufficient[ ] precis[ion] to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds." *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir.1984). With these background principles in mind, we turn to the defendants' claims of qualified immunity in these cases.

### IV.  DISCUSSION OF PLAINTIFFS' CLAIMS

#### A.  *Herring and Harasek*

We turn first to the claims asserted by both plaintiffs against Chief Herring, and by Stevens against Officer Harasek. Plaintiffs fail to present even the barest factual support for their claims of constitu-

tional violations by either Herring or Harasek, and we therefore order the district court to dismiss these claims. Stevens' common law tort claim against Harasek, while cognizable on its face under District of Columbia law, cannot survive Harasek's responding motion to dismiss on grounds of qualified immunity.

1.  *Herring,* Nos. 86–5561 & 86–5565

Martin and Stevens asserted essentially identical claims against Chief Herring:

> On information and belief, persons other than Plaintiff have been arrested by and assaulted by U.S. Park Police officers, when they had violated no law and are afterward charged with the offense of Disorderly Conduct and Disobeying the Order of a Police officer. Most, if not all, of these charges are dismissed before being brought to trial....

> On information and belief, ... Defendants have either affirmatively permitted this practice of arrest of persons without probable cause or have failed to establish systems and procedures adequate to provide reasonable assurances that persons are not improperly arrested and assaulted....[42]

Chief Herring moved for immediate judgment dismissing these claims in both actions; he asserted that plaintiffs had not "set forth specific facts showing that there is a genuine issue for trial"[43] regarding

---

**40.**  Plaintiffs argue that this "heightened pleading standard" is applicable *only* to claims involving allegations of "malice" or "improper motive." *See* Brief for Appellees at 45–46. We disagree. It is true that the heightened standard was first announced in the context of concern that "allegations of unconstitutional motive ... offer[ ] ... litigants a possible means to circumvent the [*Harlow*] rule, simply by pleading that any act was performed with an intent to violate clearly established constitutional rights and thereby surmounting the threshold test set out in *Harlow.*" *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir.1984). Subsequently, however, we applied this pleading standard in a case where the question of the defendant's immunity turned exclusively on objective factors. *See Smith v. Nixon*, 807 F.2d 197, 200–04 (D.C.Cir.1986) (applying the heightened pleading standard to de-

termine whether "plaintiff's complaint alleges concrete facts ... casting doubt on the objective reasonableness" of the defendants' actions).

**41.**  As described below, *see infra* Section IV.A.1, this heightened pleading standard also bears on the degree of *factual* specificity required in plaintiff's complaint.

**42.**  *Martin* Complaint ¶¶ 47–48, *reprinted in* J.A. at 19–20; *Stevens* Complaint ¶¶ 56–57, *reprinted in* J.A. at 103–04.

**43.**  Defendants' Motion to Dismiss or for Summary Judgment at 15, quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

the existence of the alleged unconstitutional arrest policy. The district court denied Herring's motions without prejudice. The court acknowledged that plaintiffs' allegations are "unsupported" and "conclusory,"[44] but found Herring's summary judgment motions premature: "Under Fed.R. Civ.P. 56 when faced with a motion for summary judgment a party is entitled to discovery sufficient to enable him to oppose the motion."[45] Plaintiffs, the district court ruled, had not had an opportunity to pursue "sufficient" discovery, and Herring's motions were therefore denied.

Application of pre-trial procedural rules to actions for damages against public officers is a perplexing, still developing area of the law. We set forth below our understanding of the current state of the governing precedent, and we explain why we hold that immediate judgment must be entered in Chief Herring's favor.

■ Herring's appeal presents two discrete questions. First, did the evidence indicate a "genuine issue," within the meaning of Rule 56, as to Herring's responsibility for, or participation in, the alleged "practice of arrest of persons without probable cause"? This question is readily resolved, for we find no factual support for plaintiffs' claims that a pattern of arrests without cause pervades U.S. Park Police practices. Each plaintiff points to a single instance—his or her own arrest—as illustrative of the alleged unlawful pattern; be-

yond these personal encounters, plaintiffs tender only the "conclusory allegations" to which the district court referred.[46]

Our opinion in *Carter v. District of Columbia,* 795 F.2d 116 (D.C.Cir.1986), highlights the deficiencies in plaintiffs' presentations. In *Carter,* plaintiffs alleged a similar "policy or established custom of deliberate indifference to police misconduct," *id.* at 122, on the part of the D.C. Metropolitan Police Department and the Chief of Police. We upheld the entry of directed verdicts in both defendants' favor;[47] while plaintiffs came forward with evidence of "assorted actual instances of misconduct,"[48] *id.* at 124, their "catalog of disquieting events [was] not sufficient to demonstrate a pervasive pattern of police officer indulgence in the use of excessive force, persisting in the District because of the MPD's tacit approval." *Id.* at 123. The incidents cited by the *Carter* plaintiffs were "scattered," *id.,* and did not "support an inference that the instances would not [have] occur[red] but for municipal tolerance of the practice in question." *Id.* at 124.

As the basis for inferring a general practice in their cases, Martin and Stevens urge "instances" of alleged police misconduct not merely "scattered" but wholly isolated. One instance, however egregious, does not a pattern or practice make. As the Supreme Court has recently observed, "a party who fails to make a showing sufficient to establish the existence of an element

---

**44.** *Martin* Opinion at 14–15, *reprinted in* J.A. at 43–44; *Stevens* Opinion at 13–14, *reprinted in* J.A. at 128–29.

**45.** *Martin* Opinion at 16, *reprinted in* J.A. at 45.

**46.** *See supra,* text at note 44.

**47.** The standard for resolving motions for summary judgment "mirrors the standard for a directed verdict under [Fed.R.Civ.P.] 50(a)." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**48.** The instances of misconduct to which the plaintiffs in *Carter* pointed included:
(1) the testimony of witness Craig Scott that in May 1982, police officers beat him repeatedly both at the scene of his arrest and

after taking him into custody; (2) the death of prisoner Darrell Rhones in police custody in December 1983, and the D.C. Medical Examiner's conclusion that the death was caused by a "choke-hold" administered by police officers; (3) the death of seven persons, acknowledged by Police Chief Turner, in incidents involving D.C. police in a two-month period in late 1983 and early 1984; (4) a fine imposed against officer Vanderbloemen for striking two persons without cause, and improperly arresting one of them; (5) the reprimand of officer Markovich for looping a belt around the neck of a prisoner and taunting him; and (6) the police chief's admission that officer Anderson had kicked a handcuffed suspect. *Carter v. District of Columbia,* 795 F.2d 116, 123 (D.C.Cir.1986) (citations omitted).

essential to establish that party's case, and on which that party will bear the burden at trial"—an apt description of Martin and Stevens here—cannot withstand an opponent's motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

We thus can answer the first question (did the evidence cited by plaintiffs indicate a "genuine issue") by straightforward application of familiar principles governing resolution of motions under FED.R.CIV.P. 56(c); we need take no special cognizance of the defendant's immunity claims in reaching our conclusion. *See Halperin v. Kissinger,* 807 F.2d 180, 188–89 (D.C.Cir. 1986) (*Harlow's* reformulation of the qualified immunity defense "did not ... alter the burden that rule 56(c) of the Federal Rules of Civil Procedure places on the movant to demonstrate, as a condition of summary judgment, that the objective inquiry raises 'no genuine issue as to any material fact....' "); [49] *see also Briggs v. Goodwin,* 698 F.2d 486, 489 n. 2 (D.C.Cir.) (the "rules governing summary judgment in cases involving officials claiming a qualified immunity do not differ from those applicable in other contexts"), *vacated on other grounds,* 712 F.2d 1444 (D.C.Cir.1983).

■ This brings us to the second question Herring's appeal raises: did the district court err in deferring final disposition of Herring's motions in order to give plaintiffs an opportunity to uncover, through discovery, "specific facts showing that there is a genuine issue for trial"? *See* FED.R.CIV.P. 56(e). We hold, in light of the special nature of the immunity defense, that dispositive rulings on Herring's motions should not have been deferred.

While "[a] plaintiff's hope that further evidence may develop prior to trial is an 'insufficient basis upon which to justify the *denial* of [defendant's summary judgment] motion,' " *Martin,* 812 F.2d at 1430 (emphasis added), quoting *Contemporary Missions, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981), a district judge may *defer* a final ruling on that motion, pending further discovery, where the nonmovant avers that "he cannot for reasons stated present by affidavit facts essential to justify his opposition." FED.R. CIV.P. 56(f). Indeed, a reasonable opportunity to complete discovery before grappling with a summary judgment motion is the norm. *See Celotex,* 106 S.Ct. at 2554–55 ("any potential problem with ... premature [summary judgment] motions can be adequately dealt with under Rule 56(f), which allows [deferral of] a summary judgment motion ... if the nonmoving party has not had an opportunity to make full discovery"); *see also Committee for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 783, 787–88 (D.C.Cir.1971) ("Rule 56[(f)] clearly contemplates that the parties shall have opportunity for deposition in order to establish the existence of a material issue"); *Sames v. Cable,* 732 F.2d 49, 51–52 (3d Cir.1984) (reversing district court's entry of summary judgment for defendants where "pertinent discovery requests were outstanding"). *See generally* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2741 at 541–48 (2d ed. 1983) ("One of the most common reasons offered under Rule 56(f) for being unable to present specific facts in opposition to a summary judgment motion is insufficient time or opportunity to engage in discovery.").

Where public official defendants invoking an immunity from suit are involved, however, a case is no longer "ordinary" in this regard, for "[d]iscovery is itself one of the burdens from which defendants are

---

**49.** The movant's burden referred to in the text quotation is to "inform[] the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where, as in the instant case, "the nonmoving party will bear the burden of proof at trial on a dispositive issue"—*i.e.,* the existence of the alleged arrest policy—it is the nonmovant's responsibility to "make a showing sufficient to establish the existence of an element essential to [the non-movant's] case." *Id.*

sheltered by the immunity doctrine." *Martin*, 812 F.2d at 1430; *see also Anderson*, — U.S. at —, 107 S.Ct. at 3042 n. 6 ("One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government'."), quoting *Harlow*, 457 U.S. at 817, 102 S.Ct. at 2737–38; *Mitchell v. Forsyth*, 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1986) (the "essence" of official immunity is "its possessor's entitlement not to have to … stand trial *or face the other burdens of litigation*") (emphasis added); *Smith*, 807 F.2d at 200–201 (*Harlow* directed against the "primary evil" of " 'broad-ranging discovery and the deposing of numerous persons' "), quoting *Harlow*, 457 U.S. at 815–17, 102 S.Ct. at 2736–37.

Two lines of authority are thus opposed, one tending towards deferral of a ruling on Herring's summary judgment motions, the other towards immediate final disposition. Our precedent attempts to reconcile this conflict by applying the above-mentioned "heightened pleading standard," *see supra* p. 253, to damage actions against government officials, requiring plaintiffs normally to come forward with "nonconclusory allegations of evidence [if they are] to proceed to discovery on the claim." *Hobson*, 737 F.2d at 29. This standard would not serve its intended function—protecting public officials from becoming "unduly enmesh[ed]" in "protracted discovery," *Hobson*, 737 F.2d at 30—unless it were read to restrict the otherwise applicable authority of a trial judge to permit discovery to proceed so that plaintiffs can uncover "facts essential to justify [their] opposition" to a motion for summary judgment. FED.R.CIV. P. 56(f).

The heightened pleading standard will thus operate, in practice, much like Rule 9(b)'s requirement that "the circumstances constituting fraud or mistake shall be stated [in the complaint] *with particularity*." FED.R.CIV.P. 9(b) (emphasis added). Because conclusory allegations of unconstitu-

tional or otherwise illegal conduct will not withstand a public official's dispositive pretrial motion, and because plaintiffs cannot expect the court's assistance in obtaining the necessary factual support, plaintiffs bringing suit against public officials generally must put forward, in their complaints or other supporting materials, greater factual specificity and "particularity" than is usually required.

We emphasize that this heightened standard restricts, but does not eliminate, the trial court's Rule 56(f) discretion. *See Martin*, 812 F.2d at 1436–38 (a "blanket restriction on *all* discovery prior to the resolution of the qualified immunity issue" could in some circumstances unfairly penalize plaintiffs seeking " 'crucial facts … in the control of the opposing party' "), quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1278 (D.C.Cir.1981). Difficult cases will no doubt arise calling for fine judgments as to the sufficiency of a plaintiff's showing. Martin and Stevens, however, do not tender such a case. We have no warrant to subject Park Police officials to a "fishing expedition in government waters," *Ellsberg v. Mitchell*, 807 F.2d 204, 208 (D.C.Cir.1986), on the basis of wholly unsubstantiated charges. The broadsides against Herring levelled by Martin and Stevens fail to make out a *prima facie* case that Herring "affirmatively permitted" repeated illegal activity on the part of his subordinates; indeed, the allegations do not support even the most tenuous of inferences that such activity routinely took place. Accordingly, we remand this portion of the proceedings with instructions that judgment be entered in Herring's favor on all claims against him.

### 2. *Harasek*, No. 86–5565

Stevens brought two claims against Officer Harasek, one for "conspir[ing] to violate her constitutional rights [in violation of] 42 U.S.C. § 1985," [50] the other for "negligently breach[ing] [his] affirmative duty to intervene and prevent Defendant Stover from unlawfully arresting and assaulting

---

**50.** *Stevens* Complaint ¶ 62, *reprinted in* J.A. at 105.

Plaintiff." [51] In support of her constitutional claim, Stevens alleged that Harasek made untrue statements "[s]imilar" [52] to those made by Officer McKinstry—*i.e.*, that Stevens "was honking her horn while in traffic and that she drove away from [McKinstry] when he attempted to obtain her license and registration" [53]—statements "subsequently used in an effort to obtain an indictment against Plaintiff." [54] As to her common law claim, Stevens asserted that "Harasek [stood] there with his hands in his pocket" while she "was being forcibly and brutally handcuffed and pressed against the rear of her vehicle[.]" [55]

### a. *The constitutional claim*

■ As the district court observed, to state a claim under 42 U.S.C. § 1985, Stevens must allege:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, ... and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States.

*Hobson*, 737 F.2d at 14; *see Griffin v. Breckenridge*, 403 U.S. 88, 102–103 (1971). The statute "does not apply to *all* conspiratorial tortious interferences with the rights of others, but only those motivated by some class-based, invidiously discriminatory animus." *Hobson*, 737 F.2d at 14.

The district court denied Harasek's motion for dismissal of this claim, or in the alternative for summary judgment, with this observation:

To make out her prima facie case plaintiff relies on Metropolitan Police Department documents showing that defend-

ants Stover and Harasek conferred before officer McKinstry testified before the grand jury. The requisite discriminatory animus is found in the reference to the plaintiff by one officer as a "black bitch." This is adequate to survive a motion to dismiss. [56]

We disagree. "[U]nsupported factual allegations which fail to specify in detail the factual basis necessary to enable [defendants] to intelligently prepare their defense, will not suffice to sustain a claim of governmental conspiracy to deprive [plaintiff] of [her] constitutional rights." *Hobson*, 737 F.2d at 30, quoting *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977); *see also id.* at 30 n. 87 (citing cases requiring "particularity in pleading civil rights complaints"). Here again, measuring Stevens' claim against the indicated heightened pleading standard must result in its dismissal. The record shows only that Harasek "conferred" with Officer Stover prior to Officer McKinstry's grand jury testimony, and that Harasek's allegedly false statements helped to secure Stevens' indictment. Even accepting these two factual allegations as true, the inference Stevens is apparently asking us to draw—that the three officers agreed to testify falsely and thereby obtain Stevens' indictment—is a most tenuous one, hardly an adequate foundation on which to base a complaint of this kind. [57]

### b. *The common law claim*

■ Stevens next maintains that Harasek's failure to intervene on her behalf while Officer Stover was assaulting her constitutes an actionable breach of Harasek's duty to protect her from harm. This claim is met, first, by Harasek's assertion that he owed Stevens no such duty and

---

**51.** *Id.* ¶ 68, *reprinted in* J.A. at 106.

**52.** *Id.* ¶ 50, *reprinted in* J.A. at 102.

**53.** *Id.*

**54.** *Id.*

**55.** *Id.* ¶ 30, *reprinted in* J.A. at 99.

**56.** *Stevens* Opinion at 14, *reprinted in* J.A. at 129.

**57.** We note, additionally, that witnesses at grand jury proceedings are immune from civil liability on claims arising out of their allegedly false testimony. *Briggs v. Goodwin*, 712 F.2d 1444, 1448–49 (D.C.Cir.1983). If Stevens' conspiracy

claim rests on an agreement among the officers to perjure themselves—her complaint is less than lucid on this score—the "absolute immunity" announced in *Briggs* would bar her action. *See Martin v. D.C. Metropolitan Police Department*, 812 F.2d at 1429 & n. 15 (finding "no logical justification for treating differently an agreement to perform acts to which absolute immunity attaches ... and the individual acts themselves"); *Cooper v. O'Connor*, 99 F.2d 135, 142 (D.C.Cir.) ("Accusing [the defendants] jointly, or more by way of a count in conspiracy, gives [plaintiff's] case no more virtue than if he had proceeded against each [defendant] singly."), *cert. denied*, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938).

that, as a result, no cognizable negligence claim has been stated.[58]

As far as we can determine, this precise question—whether a law enforcement officer is answerable in damages for standing by and failing to protect a member of the public from an assault allegedly perpetrated by a fellow officer—has never been squarely addressed by the District of Columbia courts. We are satisfied, nonetheless, that Stevens' complaint, at the threshold, stated a cognizable claim under principles reflected in case law governing negligence actions against law enforcement officers in the District of Columbia.

In two recent cases, the D.C. Court of Appeals, sitting en banc, has considered a question bearing upon the one presented here: in what circumstances is a police officers' general duty to protect the *public* from harm a sufficient base on which to premise liability for a failure to protect an *individual* from harm caused by a third party? *Morgan v. District of Columbia,* 468 A.2d 1306 (D.C.1983) (en banc); *Warren v. District of Columbia,* 444 A.2d 1 (D.C.1981) (en banc). As these cases make clear, only where "the police and the individual are in a special relationship different from that existing between police and citizens generally," *Warren,* 444 A.2d at 5, can a sufficiently particularized "duty to protect" arise rendering the officer potentially liable for a failure to act. *See also Morgan,* 468 A.2d at 1312–15.[59] Absent any such "special relationship," the officer's duty is "a public duty, for neglect of which the officer is answerable to the public and punishable by indictment only." *Id.* at 1311, quoting *South v. Maryland,* 59 U.S. (18 How.) 396, 403, 15 L.Ed. 433 (1856).

In determining whether the necessary "special relationship" exists in a given situation, the District of Columbia courts look to see whether the police have "beg[un] to act in behalf of a particular citizen in such a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community." *Id.* at 1312. Requiring some "affirmative undertaking to protect a particular individ-

ual," *id.* at 1314, before a specific duty to the plaintiff will be recognized avoids conflict with the primary policy supporting the "no-duty" rule: the "practical realization that individuals, juries and courts are ill-equipped to judge 'considered legislative-executive decision[s]' as to how particular community resources should be or should have been allocated to protect individual members of the public." *Id.* at 1311, quoting *Riss v. City of New York,* 22 N.Y.2d 579, 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968). Once the police have "exercised [their] discretion and chosen to act," imposing a "duty to proceed with reasonable care to protect people whom *they have particularly placed in peril*" does not "interpose the judgment of a jury for the discretion of the police." *Morgan,* 468 A.2d at 1313 (emphasis added).

We think Officer Stover's "affirmative undertakings"—forcibly removing Stevens from her car, handcuffing her and placing her in police custody—sufficient to establish a "special relationship" between Stevens and the police. Once Stevens was denied, by Stover's actions, the most basic means of self-protection, the "quotient of risk" to which she was exposed rose significantly; the officers thus incurred an obligation to take reasonable steps to insure that the physical harm to which Stevens was vulnerable did not materialize.

We express no opinion as to the extent of that obligation or the steps a reasonable officer in Harasek's position must take in order to satisfy it. We hold only that Stevens' allegations set forth a cognizable negligence claim which, if proved, and not met by a dispositive defense, could subject Harasek to liability.

■ This does not end our inquiry, however, for Harasek has asserted that, even assuming the threshold validity of Stevens' negligence claim, her entire case against him must be dismissed on the basis of an immunity from suit. Under the qualified immunity standard we have declared applicable to this claim, *see supra* pp. 251–254, we find Harasek's showing of the "objective reasonableness" of his actions suffi-

---

**58.** Brief for Appellants at 37–38 ("[T]here is no case law of which we are aware that would require that Harasek be held individually liable for failing to intervene and 'protect' Stevens from Stover.").

**59.** *See generally* Note, *Police Liability for Negligent Failure to Prevent Crime,* 94 HARV.L.REV.

821, 824 (1981) (all jurisdictions adhere to the doctrine that "a law enforcement officer's duty to protect the citizenry is a general duty owed to the public as a whole," while also "recogniz[ing] a duty when a 'special relationship' exists between the plaintiff and the police").

cient to warrant entry of judgment in his favor.

Harasek's action, in failing to intervene on Stevens' behalf, must be placed in the context of the transpiring events and the information Harasek possessed. According to Stevens' own account, shortly after Officer Stover approached her vehicle, Stover began "hysterically screaming to [Officer] Harasek[:] 'She's got a gun'."[60] At this stage of the encounter, again according to Stevens, while Stover was "forcibly and brutally handcuff[ing] and press[ing] [Stevens] against the rear of her vehicle," Harasek "[stood] there with his hands in his pockets."[61]

Shortly thereafter, once more in Stevens' words, she was "drag[ged] to [Stover's] unmarked police cruiser ... some 500 feet [away from Stevens'] car."[62] Once she was inside the cruiser, Stover allegedly intensified his attack on her.[63] Stevens does not claim that Harasek was involved in, or could even see, the alleged attack inside the cruiser.[64] According to Harasek's uncontradicted account,[65] after Stover took Stevens to the cruiser, Harasek radioed a request for assistance on his portable radio; he then "went back and retrieved [Stevens'] pocketbook[,] which was lying in the street."[66] Harasek recalls looking through the pocketbook for the weapon to which Stover had referred, and finding nothing but Stevens' police ID badge and other non-incriminating material.[67]

Given these facts, we are satisfied that the alleged unlawfulness of Harasek's failure to intervene on Stevens' behalf would not have been "apparent," *Anderson*, —— U.S. ——, 107 S.Ct. at 3039, to a reasonable officer in Harasek's shoes. Harasek had a fully rational basis for anticipating that Stevens had a gun, possibly on her person, at the time Stover pulled her from her vehicle. Stover's attempts to subdue and handcuff Stevens could therefore have been viewed by Harasek as justified by the

threat he could reasonably have thought she posed to the officers' safety. When Stover began his allegedly brutal and unprovoked attack on a handcuffed and defenseless suspect, he and Stevens were inside a police cruiser some 500 feet away from Harasek. We find no basis for inferring, even assuming the truth of Stevens' allegations, that Harasek could have seen that attack clearly enough to render his failure to come to Stevens' aid unreasonable. Our view on this matter is reinforced by the apparent failure of Stevens' passengers—who surely must have been at least as concerned with Stevens' treatment inside the cruiser as was Harasek—to see the alleged beating.[68]

For these reasons, we hold that Harasek is immune from suit on Stevens' negligence charge, and we direct the district court to dismiss that last remaining claim against him.

### B. *Constitutional Claims Against Malhoyt,* No. 86–5561

As recounted above, *see supra* p. 244, Martin alleged that Officer Malhoyt violated his "Fourth Amendment right to be free from unreasonable seizure, Fifth Amendment right not to be deprived of liberty or property with [out] due process of law, [and] Sixth Amendment right to be advised of charges brought against him."[69] Malhoyt countered that "none of [Martin's] allegations rise[s] to the level of a constitutional tort,"[70] *i.e.,* that no constitutional rights, let alone "clearly established" constitutional rights, were violated by Malhoyt's alleged conduct. Except as to Martin's claim of a fourth amendment violation, we agree with Malhoyt's contention.

#### 1. *The sixth amendment claim*

■ Martin asserts that approximately four hours passed between the time of his arrest and his being informed of the charges against him (disorderly conduct

60. *Stevens* Complaint ¶ 30, *reprinted in* J.A. at 99.

61. *Id.*

62. *Id.* ¶ 32, *reprinted in* J.A. at 99.

63. *See id.* ¶¶ 33–38, *reprinted in* J.A. 99–100; *see also supra,* text at notes 9–10.

64. Neither of Stevens' passengers, both of whom remained in or near her car after Stevens was taken to the police cruiser, referred in their affidavits to any of Stevens' or Officer Stover's actions in the cruiser. *See* October 16, 1985

Affidavit of Johnnie Bush, Jr., *reprinted in* J.A. at 176–79; October 16, 1985 Affidavit of Mary Ella Stevens, *reprinted in* J.A. at 180–83.

65. *See* Harasek Interview Notes at 4, *reprinted in* J.A. at 214.

66. *Id.*

67. *Id.*

68. *See supra* note 64.

69. *Martin* Complaint ¶ 51, *reprinted in* J.A. at 20.

70. Brief for Appellants at 38.

and disobeying the order of a police officer).[71] This, we hold, does not amount to a violation of the sixth amendment right of an accused "to be informed of the nature and cause of the accusation."[72] Whatever temporal limitations may be read by implication into that clause,[73] we cannot rank a four-hour delay between arrest and notice of the charges as more than a *de minimis* abridgment of Martin's right "to be advised as to every element in respect to which it is necessary for him to prepare a defense." *United States v. Lattimore,* 215 F.2d 847, 850 (D.C.Cir.1954) (en banc).

### 2. *The remaining constitutional claims*

#### a. *The excessive force claim*

■ Martin's claim under this heading rests upon his allegation that Malhoyt used unreasonable force to effect Martin's arrest. In appraising this claim under the fourth rather than the fifth amendment,[74] we are guided by the Supreme Court's decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *Garner* clarifies that fourth amendment protection from "unreasonable ... seizures"[75]

extends not only to an officer's decision to make a particular arrest (the decision must be supported by "probable cause"); the protection extends as well to *how* the arrest is carried out. While *Garner* specifically addresses the use of deadly force, the language and logic of the opinion indicate that all police use of force in effecting arrests must meet an objective standard of reasonableness. *See Garner,* 471 U.S. at 7–9, 105 S.Ct. at 1699–1700.

*Garner's* reasonableness formulation is the one typically used in court review of fourth amendment seizures: reasonableness is to be determined by balancing the infringement of the individual's interest caused by the police action against the governmental interest served by that action. *See id.* at 8, 105 S.Ct. at 1699, quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). This balancing test is both objective and fact-sensitive; it looks to the "totality of the circumstances" known to the officer at the time of the challenged conduct, and it accords a measure of respect to the officer's judgment about the quantum of force called for in a quickly developing situation.[76]

**71.** *Martin* Complaint ¶¶ 19, 43, *reprinted in* J.A. at 13, 18.

**72.** U.S. Const. amend. VI.

**73.** *Cf.* Fed.R.Crim.P. 5(a) (accused entitled to be taken before a magistrate "without unnecessary delay" after arrest).

**74.** Martin's complaint does not explicitly link his excessive force claim to a particular constitutional provision. On appeal, however, he appears to rely on a fourth amendment analysis. *See* Brief for Appellees at 40 ("Plaintiff's initial claim for assault and battery and for a violation of his Fourth Amendment right to be free of unreasonable searches and seizures occurred prior to any notion in the mind of Officer Malhoyt that he intended to arrest Mr. Martin."). We emphasize again, *see supra* p. 253, that we require a greater degree of specificity in complaints for damages against public official defendants than in the ordinary case. The district court, we note, has ample authority, under Fed.R.Civ.P. 12(e), to require, on defendant's motion, a "more definite statement" where "vague or ambiguous" pleadings are submitted. *See also id.* 15(a) (leave to amend pleadings "shall be freely given when justice so requires").

**75.** U.S. Const. amend. IV.

**76.** The objective fourth amendment inquiry contrasts with the due process standard sometimes used to evaluate police use of force in arrests. That standard checks only force (1) disproportionate to the need presented, (2) that causes

severe injury, and (3) is intended to inflict harm. *Compare Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985), *with Gilmere v. City of Atlanta,* 774 F.2d 1495, 1502 (11th Cir.1985) (en banc). We have appraised an excessive force claim under a fifth amendment due process rubric when it occurred in a pretrial detention context, where fourth amendment concerns are less prominent. *Norris v. District of Columbia,* 737 F.2d 1148 (D.C.Cir.1984), adopting the approach taken in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973). *Garner* constrains us to conclude that due process analysis is not appropriately extended to excessive force claims, like Martin's, that arise in the context of an arrest. Moreover, the precise due process analysis in *Norris,* although not the result reached in that case, may bear recasting in light of *Garner* and well-reasoned commentary on that decision. *See* Comment, *Excessive Force Claims: Removing the Double Standard,* 53 U.Chi.L.Rev. 1369 (1986).

Furthermore, since *Garner,* the Supreme Court has indicated that the due process analysis employed in *Johnson* is superfluous when a more specific constitutional command protects the affected interest. In *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986), the Court observed: "It would indeed be surprising if ... 'conduct that shocks the conscience' or 'affords brutality the cloak of law,' and so violates [due process], ... were not also [cruel and unusual] punishment ... in violation of the Eighth [Amendment]." It would be more surprising still if such conduct were not also unreasonable under the fourth amendment.

According to Martin, the most severe infringement by Malhoyt upon Martin's interest in freedom from arrest in an excessive manner was Malhoyt's "brutally grabb[ing] [Martin] about [the] waist, ... thr[owing] [him] back into [his] driver seat ... [and] slamm[ing] [the] door on one of [Martin's] legs."[77] Martin further alleged that Malhoyt later "grabbed [Martin's] arms[,] pulled them behind [Martin's] back[,] and immediately placed [Martin] in handcuffs while pushing [him] up against [the] limousine,"[78] Malhoyt, as Martin recounts, then forced Martin to sit in a painful position in Malhoyt's police car, which aggravated Martin's previous shoulder injury.

Malhoyt, while disputing the particulars of Martin's account, asserted by way of justification that he wanted Martin in the car "for [Martin's] safety, the public's safety, and [Malhoyt's] own safety. By opening his door into traffic Mr. Martin caused a traffic hazard which was a danger to himself and the oncoming traffic.... Finally, in the event that [Martin] present[ed] any danger to [Malhoyt], [Martin would be] more easily controlled inside his car."[79] Martin does not dispute the reasonableness of such concerns, if in fact Malhoyt had and acted upon them, at the time and place of the incident. According to Martin's own story, moreover, Martin knew that Malhoyt was waiting to see whether one of Martin's passengers really was having difficulty walking; yet Martin began to move the limousine before his passengers had returned to the vehicle. This action by Martin could well have given Malhoyt cause to doubt Martin's good faith, which in turn would have increased concern on Malhoyt's part for the safety of oncoming traffic, Martin, and himself. In addition, Martin's movement of his car would have supplied support for any fear of Malhoyt's that Martin might flee.

Tested by the standard confirmed in *Garner*, we are unable to characterize the *manner* in which Malhoyt arrested Martin as objectively unreasonable in light of the rapidly unfolding sequence of events. Slamming the car door on Martin's leg causes us to pause, for that action appears malicious. But under *Garner's* objective

test, maliciousness is irrelevant. We must focus on whether Malhoyt's total conduct, objectively appraised, added up to a reasonable mode of arrest. We conclude that it did. Even the door slamming, given the apparent need for instant action, does not appear to be an extraordinary response. In sum, viewing the "totality of the circumstances," we cannot conclude that Malhoyt used unreasonable force in taking immediate steps first to confine Martin to his vehicle, then to effect his arrest.

### b. *The probable cause claim*

■ In addition to objecting to the manner in which he was arrested, Martin asserts that his fourth amendment rights were violated because there was no probable cause to arrest and detain him for disorderly conduct and disobeying a police officer's orders. It is well settled that an arrest without probable cause violates the fourth amendment. *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975). Under Martin's version of the facts, probable cause to arrest was indisputably absent. Martin asserted that "[a]fter Malhoyt threw me into my car and obtained my permit and registration, he returned to his police car *without saying anything to me.*"[80] When Martin "got out of [his] car ... and went behind [it]" to open the door for his passengers, Malhoyt, in Martin's words, "suddenly got out of his police car and while appearing to be extremely angry and upset, and *without saying one word to me*" handcuffed Martin and put him in the police car.[81]

Since Martin claims that Malhoyt said nothing at all to him at the relevant time, let alone something that could be construed as an order, under the facts as we must take them at this stage of the case, there was no probable cause for an arrest for disobeying a police officer's order. As to the charge of disorderly conduct, the only elements of the offense possibly relevant here are: "(1) Act[ing] in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; ... [or] (4) interfer[ing] with any person in any place by jostling against such person or unnecessarily crowding him" with the "intent to provoke a breach of the peace, or under cir-

---

**77.** *Martin* Affidavit at ¶ 17, *reprinted in* J.A. at 74.

**78.** *Id.* at ¶ 24, *reprinted in* J.A. at 75.

**79.** *Malhoyt* Affidavit at ¶ 7, *reprinted in* J.A. at 68.

**80.** *Martin* Affidavit at ¶ 21 (emphasis added), *reprinted in* J.A. at 75.

**81.** *Id.* at ¶¶ 23–25 (emphasis added), *reprinted in* J.A. at 75–76.

cumstances such that a breach of the peace may be occasioned thereby." D.C.Code Ann. § 22–1121 (1), (4) (1981); *see Gueory v. District of Columbia*, 408 A.2d 967 (D.C. 1979). Martin relates that he did nothing but get out of his car and stand behind it. True, as we observed above, Malhoyt might have had cause to be wary of Martin, but Martin was doing nothing to annoy or interfere with anyone at the time of his arrest. We think it plain that, accepting Martin's version of the disputed events as true, Martin's arrest was without probable cause and therefore violated the fourth amendment.

██ We turn, then, to Malhoyt's plea of qualified immunity from suit. The district court reasoned that because the relevant law—probable cause is required to arrest— was "clearly established," Malhoyt cannot surmount the *Harlow* threshold;[82] observing that the conflicting versions of the events presented a "genuine issue" as to the existence of probable cause, the district court refused to enter summary judgment for Malhoyt on his qualified immunity plea.[83]

We agree with the district court's conclusion but not its reasoning. That probable cause may have been absent when viewing the arrest *ex post* does not in and of itself establish that the officer acted in an objectively unreasonable manner *ex ante*. The relevant inquiry, as the Supreme Court recently made clear, is whether "in the light of preexisting law the unlawfulness" of Martin's arrest was "apparent." *Anderson*, —— U.S. at ——, 107 S.Ct. at 3039; *see also id.* (indicating as the pivotal issue "the objective (albeit fact-specific) question whether a reasonable officer could have believed" Martin's arrest to be lawful "in light of clearly established law and the information [Malhoyt] possessed").

Resolution of Malhoyt's motion thus turns not on whether probable cause to arrest Martin in fact existed, but on whether Malhoyt has established as a matter of law that a reasonable officer in Malhoyt's shoes would have believed it to have existed. We are confident, again assuming the truth of Martin's version of the disputed events, that no reasonable officer could

have believed that an individual who merely gets out of his car has committed either of the offenses with which Martin was charged, even assuming that Malhoyt reasonably believed that Martin was attempting to evade a citation for a parking violation. Without resolving the factual dispute as to what actually transpired between Martin and Malhoyt, we cannot say that Malhoyt has established the requisite objective reasonableness of his actions. We therefore affirm the district court's denial of Malhoyt's motion for summary judgment as that motion relates to the fourth amendment, lack of probable cause claim.

C. *Common Law Claims Against Malhoyt,* No. 86–5561, *and Stover,* No. 86–5565 [84]

██ Our disposition of the claims remaining against Officers Malhoyt and Stover [85] requires no extended analysis. Martin and Stevens have set forth detailed accounts of their encounters with these officers which, if believed, establish the tortious character of the officers' actions. In their versions, plaintiffs acted in a manner that no reasonable officer could have believed violated District of Columbia law; and they offered no resistance to the officers' commands that could justify the stern measures taken against them. As we have several times emphasized in this opinion, plaintiffs' descriptions of the episodes in suit are directly contradicted by the officers' statements, and the officers' liability will ultimately turn on which of the accounts the factfinder believes. A reviewing court's role is not to resolve these factual disputes; merely verifying their existence is sufficient, at this stage of the proceedings, for us to uphold the district court's denial of the officers' motions to dismiss these claims.

V. Issue Preclusion, No. 86–5565

██ Finally, we address Officer Stover's contention that the rule of issue preclusion (or "collateral estoppel") bars Stevens from relitigating, in the district court, issues of fact decided by the Metropolitan Police Department's Adverse Action Panel

---

**82.** *Martin* Opinion at 8–9, *reprinted in* J.A. at 37–38.

**83.** *Id.*

**84.** Officer Stover, as we earlier observed, has not appealed from the district court's denial of his motion to dismiss Stevens' constitutionally-based claims.

**85.** Both officers are charged with "false arrest, false imprisonment, assault, battery, malicious prosecution, defamation …, intentional and negligent infliction of emotion[al] distress, negligence[,] and gross negligence under the laws of the District of Columbia." *Martin* Complaint ¶ 53, *reprinted in* J.A. at 21; *Stevens* Complaint ¶ 64, *reprinted in* J.A. at 105.

(AAP).[86] The district court was first presented with this preclusion argument in the *Stevens* appellants' motion for reconsideration.[87] At that time, this appeal had already been briefed and argued. Considering it inappropriate to take any new action during the pendency of the case before this court, the district court denied the motion.[88]

Under the rule of issue preclusion, "[w]hen an issue of fact ... is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment," a party to the proceeding who had "a full and fair opportunity to litigate the issue in the first action" is generally precluded from relitigating it in a subsequent action. RESTATEMENT (SECOND) OF JUDGMENTS §§ 27, 29 (1982). In *University of Tennessee v. Elliott,* —— U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court held that "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 3227, quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966); *see Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 479–85 & n. 24, 102 S.Ct. 1883, 1896–99 & n. 24, 72 L.Ed.2d 262 (1982) (issue preclusion does not apply where party against whom earlier decision is asserted did not have a "full and fair opportunity," consistent with the procedural requirements of due process, to litigate the issue); RESTATEMENT (SECOND) OF JUDGMENTS § 83 (on preclusive effects of adjudicative determinations by administrative tribunals). *See also City Wide Learning Center, Inc. v. William C. Smith & Co.,* 488 A.2d 1310, 1313 (D.C. 1985) (discussing application of "principles of administrative collateral estoppel" under District of Columbia law).

Stevens offers no convincing reasons why the AAP proceeding in which she was involved does not meet the threshold standards set forth in *Elliott.*[89] The AAP conducted a full-scale administrative trial reviewing the MPD's proposal to remove Stevens from the police force, at the conclusion of which it issued a written decision with detailed findings of fact, conclusions of law, and recommendations.[90] Stevens was notified of the charges against her and was represented by counsel. The AAP conducted an adversary hearing, took extensive evidence, and provided Stevens the opportunity both to cross-examine witnesses against her and to present witnesses on her own behalf. Stevens does not contend that she lacked a "full and fair opportunity" to present her side of the story.

Stevens' principal argument as to why the AAP's findings should not be given preclusive effect is that she is currently exercising, under D.C.CODE ANN. § 1–606.-3(a), her right of appeal to the District of Columbia Office of Employee Appeals. The AAP's findings, according to Stevens, are therefore "not of a fixed character and cannot form the basis of a ... collateral estoppel bar to access to federal court."[91]

The pendency of an appeal, we note, does not automatically diminish the preclusive effects of a prior adjudication. *See Hunt v. Liberty Lobby, Inc.,* 707 F.2d 1493, 1497 (D.C.Cir.1983) (noting "well-settled federal law" that appeal "does not diminish the *res judicata* effects of a judgment rendered by a federal court"); RESTATEMENT (SECOND) OF JUDGMENTS § 13 & comment f (any "sufficiently firm" prior adjudication should be deemed "final" and accorded conclusive effect; the "better view is that a judgment otherwise final remains so despite the taking of an appeal unless [the] appeal actually consists of a trial de novo"). *See generally* 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4433 (1981).

According preclusive effect to a judgment from which an appeal has been taken, however, risks denying relief on the basis of a judgment that is subsequently overturned. Consequently, care should be taken in dealing with judgments that are final, but still subject to direct review. This is

---

**86.** *See supra,* text at notes 14–16. The AAP determination was adverse to Stevens on a number of factual issues relevant to the claims she asserted in the district court. *See id.*

**87.** *See supra* note 26.

**88.** *See supra* note 27.

**89.** Stevens did assert, cryptically, that the AAP members were "persons with a vested interest in the outcome of her civil case." Brief for Appellees at 37. She did not elaborate, and we are therefore unable to evaluate the possibility of systematic bias tainting the AAP's findings.

**90.** *See supra* note 14.

**91.** Brief for Appellees at 38.

particularly so, we think, where appeals from administrative adjudications are in progress. *Cf. Cartier v. Secretary of State*, 506 F.2d 191, 196 (D.C.Cir.1974) (the "doctrine of administrative *res judicata* ... has not evolved into a rigid system that is to be blindly applied in every context"); *Purter v. Heckler*, 771 F.2d 682, 691 (2d Cir.1985) (application of doctrine of *res judicata* to administrative proceedings under the Social Security Act is "not encrusted with the rigid finality that characterizes its application in purely judicial proceedings"). One potential solution to this dilemma is to defer consideration of the preclusion question until the appellate proceedings addressed to the prior judgment are concluded, provided they are moving forward with reasonable dispatch and will not be long delayed. *See In re Professional Air Traffic Controllers Organization*, 699 F.2d 539, 544 n. 18 (D.C.Cir.1983) (court asked to accord preclusive effect to judgment "may be well advised to stay its own proceedings to await the ultimate disposition of the judgment on appeal"), citing RESTATEMENT (SECOND) OF JUDGMENTS § 16 comment b.

The preclusion question was raised too late for the district court to rule on it. Because of uncertainty in the record before us, particularly with respect to the scope and pace of Stevens' appeal,[92] we think it advisable to allow the parties to air this question more fully before the district court, and we therefore remand this issue for further proceedings.

### CONCLUSION

In sum, we rule first on the immunity from suit of the U.S. Park Police officers named as defendants in this case. We hold that at least as to claims arising out of their enforcement of District of Columbia law, these officers are entitled to a qualified immunity from all such claims, common law and constitutional, asserted against them. With respect to the specific claims asserted against each individual defendant, we direct the district court to dismiss all claims against Chief Herring and Officer Harasek, as well as Martin's sixth amendment and unconstitutionally excessive force claims against Officer Malhoyt. As to all remaining claims—the fourth amendment/no probable cause claim against Malhoyt, and various common law

claims against both Malhoyt and Officer Stover—we cannot say, at this stage of the proceedings, that no "genuine issues" as to the "objective reasonableness" of the officers' actions remain. Accordingly, we affirm the district court's denial of the motions by Malhoyt and Stover to dismiss these claims.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

WILLIAMS, Circuit Judge, concurring and dissenting:

I concur in the court's disposition of the constitutional tort claims and in its careful explanation of those outcomes. I dissent only from that part of the opinion holding that U.S. Park Police officers enjoy only a qualified immunity for common law tort suits arising from acts committed while enforcing District of Columbia law. The rule adopted by the court seems to me to give inadequate weight to federal interests and to entail considerable practical difficulties. A better approach, I believe, is to recognize that the central functions of law enforcement officers are discretionary; thus, assuming that the absolute immunity of *Barr v. Mateo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), is limited to discretionary duties, such officers are entitled to absolute immunity if acting within "the outer perimeter" of their duties. *Id.* at 575, 79 S.Ct. at 1341.

### I

Federal officers' absolute immunity from state tort claims under *Barr* contrasts sharply with their merely qualified immunity to claims founded on the Constitution or a federal statute. The court, rightly I think, finds the explanation in federal supremacy concerns. *See* Maj. at 249–50 (citing *Butz v. Economou*, 438 U.S. 478, 489, 490, 495, 98 S.Ct. 2894, 2902, 2902, 2905, 57 L.Ed.2d 895 (1978)). It then proceeds to develop a special treatment for officers wielding both federal *and* local authority. Even where such officers would otherwise enjoy absolute immunity, they may not do so if they were attempting to enforce District of Columbia law at the critical times. Maj. at 251–52. In such cases, the court would limit them to a quali-

---

**92.** For example, Stevens claims that she is "entitled by law to a *de novo* hearing" on her appeal before the Office of Employee Appeals. Brief for Appellees at 38. The statute granting her an appeal right speaks only of review "upon the

record and under such such other rules and regulations which the office may issue." D.C. CODE ANN. § 1–606.3(a). The defendants contend, moreover, that Stevens herself has agreed to review on the record compiled by the AAP.

fied immunity, which will protect them only if "their actions are reasonable in light of current American law." *Id.* at 252.

I think the court's solution overlooks or at least slights the federal interests at stake when a U.S. Park Police officer enforces local law; raises difficult issues as to just how much intrusion of non-federal offenses or other interests is sufficient to trigger the rule; and will divert courts into baffling and unnecessary efforts to define some homogenized version of the law of the various states.

A federal law enforcement officer will be advancing federal interests even when he is nominally enforcing only non-federal law. For example, although the *charges* for which Malhoyt arrested Martin were local (disorderly conduct and disobeying the order of a police officer), it seems clear that Malhoyt was assigned to the Lincoln Memorial in order to protect *federal* interests—the amenity and symbolic value of the Memorial. Preventing disorderly conduct at that site helps realize federal goals.

Even in the rare situation where a Park Police officer is on non-federal property enforcing purely District law, as was Officer Stover, federal interests are involved. Although Park Police officers are authorized to enforce District law on District property by a local District statute, D.C. Code Ann. § 4–201 (1981), they actually do so not because of any direction from local authorities, but as part of an arrangement aimed at facilitating federal law enforcement. By agreement with the Metropolitan Police force, in an attempt to avoid double coverage that would waste both local and federal enforcement resources, the Park Police, though primarily responsible for patrolling federal lands, also share enforcement duties with the Metropolitan Police. Similarly, Metropolitan police help maintain the peace in the National Parks. The arrangement is practicable because federal tracts are interspersed throughout the District. Appellants' Supplemental Letter dated April 6, 1987 at 2.

The duties that the Park Police assume under this working arrangement are clearly undertaken in the interests of increasing the efficiency with which they carry out their federal mandate. Restriction of the immunity raises the cost of federal use of such working relationships. Such a cost impact of course would not necessarily justify extending federal immunity to a non-federal officer enforcing federal law under such an agreement. But recognition of the cost supports use of a purely federal rule when an indisputably federal officer appears on the surface to be enforcing only non-federal law.

Moreover, I fear that the court's rule will entail complex line-drawing, unjustified by real returns in the form of a more nuanced accommodation of federal and non-federal interests. Any case of dual jurisdiction[1] is sure to pose almost metaphysical issues of characterization.

For example, if, as appears to be the case,[2] Martin was on National Park Service property at the time of his arrest, his local law infraction was also a federal law violation. 18 U.S.C. § 13 (1982) (persons on federal property who engage in an act or omission that would offend state law within the state's jurisdiction are guilty of a like offense and subject to a like punishment). Pursuant to 16 U.S.C. §§ 1a–6(a)(1) and 1(a)–6(b)(2) (1982), Malhoyt had authority to enforce both federal and state law on National Park Service property. Thus, even if Malhoyt arrested Martin on a charge designated in non-federal terms, the arrest appears simultaneously to have been an enforcement of federal law (or, under Martin's account, a purported enforcement). If the presence of the non-federal violation is enough to deny Malhoyt a conventional federal officer's immunity, then all kinds of non-federal entanglements may also do so.

Suppose, for example, that Malhoyt had charged Martin solely with a violation of 18 U.S.C. § 13? Or suppose he had added independent federal offenses which, for all

---

1. As summarized in the majority opinion at 250–51, U.S. Park police are authorized by federal law to enforce local law within a National Park, 16 U.S.C. § 1a–6(b)(2), and to enforce violations of local law as violations of federal law within National Parks. 18 U.S.C. § 13. Pursuant to District of Columbia law, they are endowed with the same powers as the local metropolitan police to enforce District law anywhere in the District. D.C.Code Ann. § 4–201

(1981). Because of the working arrangement between the Park Police and the Metropolitan Police, *see* 266 *supra,* each enforces the other jurisdiction's law with some frequency. Appellants' Supplemental Letter dated April 6, 1987 at 2.

2. See Appellants' Supplemental Letter dated April 6, 1987 at 3. *But see* Maj. at 251 n. 36 (asserting that the location of the arrest is uncertain).

we know, may have been available? What if he had added a federal offense but the plaintiff claimed—as many inevitably will—that there was no probable cause to support the federal charge? What if the officer brought only federal charges, but the plaintiff argues that the arrest was *really* for non-federal offenses? Does the answer to any of the above change if the arrest occurs off federal property?

Finally, I think the court's solution to the issue of "balkanized" law—the problem of officers' being unaware of legal distinctions among the jurisdictions into which their work may carry them—will prove troublesome. The proposed solution is that federal officers will be protected if their actions are "reasonable in light of *current American law.*" Maj. at 252, quoting *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (emphasis added). The standard was enunciated by the Court in the context of federal constitutional law and will not readily fit the problem of multiple jurisdictions. I have no doubt that courts can discover a "transcendental body of law outside of any particular State," *see Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938) (quoting Holmes, J., dissenting, in *Black & White Taxicab Co. v. Brown & Yellow Taxicab Co.,* 276 U.S. 518, 533, 48 S.Ct. 404, 408, 72 L.Ed. 681 (1927)), but the task—much like the line-drawing problems—will prove awkward.

Thus the court's solution, while quite properly aiming a nuanced balance of federal and state interests, appears unnecessarily parsimonious in its protection of federal officers, and threatens to generate serious process costs in sifting out its implications—the time of lawyers and courts and uncertainty for all who are subject to the rule.

## II

My reluctance to employ a special rule based on the District of Columbia entanglements forces me to consider whether *Barr's* absolute immunity to state tort claims encompasses the conduct of federal law enforcement officers "on the beat." Plaintiffs argue that the *Barr* immunity applies only to discretionary functions and that the activities of officers on patrol do not qualify. As the majority notes, the

question is one that neither the Supreme Court nor this circuit has yet addressed, though the application of *Barr* to officers of limited discretion is now pending in the Supreme Court. *Erwin v. Westfall,* 785 F.2d 1551 (11th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 1346, 94 L.Ed.2d 517 (1987).

As the court notes, the federal courts have varied widely in their view as to the scope of *Barr*-type immunity, some extending it to all federal officers regardless of function, some only to those at the planning or policy level, and some to officers exercising limited discretion. *See* Maj. at 248. This court has found that the *Barr* immunity is available for federal officials performing "discretionary duties," *Sami v. United States,* 617 F.2d 755, 771 (D.C.Cir. 1979), implying that it would not be available to those performing non-discretionary functions. *Barr* itself appears in dictum to require that the functions performed be discretionary. 360 U.S. at 573–74, 79 S.Ct. at 1340–41; *accord, Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982) (dictum).

Although the Court in *Barr* did not specify the categories of federal employees to which absolute immunity would apply, the plurality opinion clearly stated that the availability of immunity did not depend on rank or title. 360 U.S. at 573, 79 S.Ct. at 1340. It acknowledged that heads of departments would be able to invoke immunity more frequently than lower-echelon employees, but explained that that was true only "because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." 360 U.S. at 573, 79 S.Ct. at 1340. It is, the Court explained, "the relation of the act complained of to 'matters committed by law to his control or supervision' ... which must provide the guide in delineating the scope" of the immunity. *Id.* at 573–74, 79 S.Ct. at 1341.

This "guide" is susceptible of at least two readings. It might mean that if the officer enjoys a relatively modest discretion, the immunity that he enjoys, even for discretionary acts, must be diminished. On this view, assuming that police officers exercise markedly less discretion than high-ranking officials, they would enjoy a non-absolute immunity even when performing discretionary functions. Alternatively, the

Court might mean only that though federal officers' immunity to state tort claims is absolute, the lower-ranking officials will have less frequent occasion to invoke it. The latter seems to me the better reading.

In a closely related context the Supreme Court has recently considered the link between discretionary functions and immunity, in terms suggesting that immunity (1) applies even for modest degrees of discretion and (2) is not to vary with the degree of discretion. In *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), a plaintiff making "constitutional tort" claims against state officers under 42 U.S.C. § 1983 (1982) asserted that the defendants were performing a "ministerial" duty because state regulations prescribed certain procedures (with which the officers had allegedly not complied). The Court responded:

> A law that fails to *specify the precise action that the official must take in each instance* creates only discretionary authority; and that authority remains discretionary however egregiously abused.

*Id.* at 196–97 n. 14, 104 S.Ct. at 3020 n. 14 (emphasis added).

This concept of discretion appears to fit as well in the context of absolute immunity to state tort claims (*Barr*) as in that of qualified immunity to constitutional claims (*Butz*). Indeed, a narrower concept of discretion for defining immunity to state tort claims than for immunity to constitutional torts would reverse the ranking chosen by the Supreme Court in *Butz*, exposing officials to state law claims for acts that enjoy immunity from constitutional ones. The Court in *Butz* observed that "we are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution." 438 U.S. at 495, 98 S.Ct. at 2905.

Moreover, an ancillary advantage of *Davis's* broad concept of discretion is that it avoids the drawbacks of multiple levels of discretion. A rule affording less than absolute immunity to officers performing acts of limited discretion would require courts to classify functions in terms of the degree of discretion, an elusive task. In the meantime, federal officers would face uncertainty, quite inconsistent with the purpose of immunity: to free them from undue inhibitions on performance of their duties.

Extension of *Davis* to the state tort context, however, is not self-evidently correct. The consequences of a broad definition of discretion are stronger (absolute rather than qualified immunity), arguably suggesting that the line should be drawn more restrictively. But the strong result flows, as the majority has indicated, from the United States's interest in protecting its officers from a multiplicity of legal claims independent of (and occasionally hostile to) federal law.

Accordingly, though the issue is hardly clear, it seems to me appropriate to employ the *Davis* standard in identifying discretionary functions in the context of common law tort claims against federal officers. At least one court of appeals has done so. *Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 464 (1st Cir.1985) (as a fallback to the court's view that no discretion at all is needed for application of *Barr*-type immunity).[3]

Under the *Davis* standard, law enforcement officers "on the beat" evidently exercise discretion. They will often have neither the time nor resources to arrest for every apparent offense; they must then confine themselves to the most egregious. Even when plenty of time is available, everyday experience suggests that officers do (and should) limit themselves to a warning in many instances of relatively technical violations.[4]

---

**3.** The discretionary function exception of the Federal Torts Claims Act, 28 U.S.C. § 2680(a) (1982), has been construed as negating liability for negligence only "at the planning rather than operational level," *Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953), and does *not* supply an appropriate line. Where the government itself is liable, as under the FTCA, high officials can mediate between the operational workers and liability, not treating every act that incurs liability as a black

mark on the employee's escutcheon. No such mediation is possible where the officer himself is faced with liability and—what will often be more to the point—with the expenses of exoneration.

**4.** Appellees contend that because District law makes it a criminal offense for a police officer to fail to make an arrest after witnessing a crime, D.C.Code § 4-142, an arrest by a Park Police officer on District property is therefore a

There are dicta in a number of decisions of the Supreme Court and this circuit that law enforcement officers do not enjoy absolute immunity against, for example, common law false arrest claims. *Doe v. McMillan,* 412 U.S. 306, 319, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973) (in finding *no* immunity for officers whose sole discretion consisted of "estimating demand for particular documents and adjusting the supply accordingly," a discretion irrelevant to the claim, Court observes "policemen and like officials apparently enjoy a more limited privilege" than that of "executive officers with discretionary functions"); *Pierson v. Ray,* 386 U.S. 547, 553–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967) (in exonerating state police officers on basis of their claim of good faith defense to claim under § 1938, Court states that the "common law has never granted police officers an absolute and unqualified immunity"); *Sami v. United States,* 617 F.2d 755, 770 (D.C.Cir. 1979) (though finding that the defendant officer may invoke absolute immunity on grounds that the particular circumstances presented little need to deter misconduct, court notes that police officers are traditionally granted "only a restrictive immunity against claims for false arrest and imprisonment"); *see also Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1346 (2d Cir.1972) (on remand) (on pre-*Butz* assumption that immunity would be absolute for constitutional tort claim, court finds need for deterrence of federal police officers' illegal acts so great that their duties should be classified as nondiscretionary).

All these suggestions appear to depend on a readiness to create multiple degrees of immunity fitting different levels of discretion. Though *Davis* did not directly address the point, its broad definition of dis-

cretion—seemingly sweeping up all instances of non-trivial discretion—militates against such an approach. So does sound policy.

Even on plaintiffs' allegations, the defendants here were carrying out duties without directions "specify[ing] the precise action that [they] must take in each instance." *Davis,* 468 U.S. at 196–97 n. 14, 104 S.Ct. at 3020 n. 14. Accordingly, I believe they should enjoy absolute immunity to the common law tort claims.[5]

## ORDER

Upon consideration of appellants' petition for rehearing, it is ORDERED, by the Court, that the petition is denied.

GINSBURG, Ruth B., Circuit Judge, with whom Circuit Judge WILLIAMS, and Senior Circuit Judge McGOWAN, join: The petition for rehearing invites the panel, or the court en banc, to extend the absolute immunity rule of *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), to all lower-ranking federal officers of limited discretion, particularly to all federal law enforcement officers "on the beat." Whether *Barr* reaches all federal employees acting within the scope of their employment, or at least those exercising a modicum of discretion, is an issue currently pending before the Supreme Court. *Westfall v. Erwin* (No. 86–714) (argued Nov. 2, 1987). The panel opinion in the case at hand stressed the need for "guidance from Higher Authority," and noted the pendency of *Westfall v. Erwin. See Martin v. Malhoyt,* supra, 830 F.2d 237, 246–47. Dissenting Opinion, supra at 268.[1]

---

ministerial activity. Appellees' Brief at 26. Even if District of Columbia law controlled the exercise of federal law enforcement officers' discretion, which it does not, it would be naive, in the absence of proof that the provision is enforced, to suppose that the District of Columbia has in fact nullified the judgment of officers on the beat.

5. Of course the immunity would not be available if they were acting beyond the "outer perimeter" of their official duties. No such claim can be made against Malhoyt; on Stevens's contentions, which we must accept as true, Stover may have exceeded that perimeter. I would

remand for that determination, if it should prove necessary in light of the possible preclusion claim.

1. Contrary to the distorted portrait of this circuit's precedent in the rehearing petition, no prior decision of this court *holds* that *Barr*-style immunity covers the "officer on the beat." In *Martin v. D.C. Metropolitan Police Dep't,* 812 F.2d 1425, 1428 n. 11 (D.C.Cir.1987), we noted that we did not confront the question because, without regard to *Barr,* absolute immunity is the prevailing common law rule where malicious prosecution is alleged.

Should the Supreme Court extend *Barr*'s shelter to all federal employees with respect to all common law torts, it is entirely clear that the district court would be bound to dismiss the common law claims against U.S. Park Police officers Malhoyt and Stover. Furthermore, it is at least implicit in the majority opinion that the common law claims against the two officers could not survive should the Supreme Court hold *Barr* applicable to all lower-ranking federal officers in fact entrusted with some, albeit modest, discretion. On the other hand, the common law claims would remain viable should the Supreme Court limit *Barr* "to employees at the policymaking or planning level, as distinguished from employees at the operational level who function day to day under established procedures and guidelines." *See Martin v. Malhoyt*, Maj. at 248.

In view of the "hardly clear" current state of Supreme Court precedent in this area, *see id.*, Dis. supra at 269, and the prospect of guidance forthcoming soon, (1) we anticipate that the district court will await the Supreme Court's decision in *Westfall v. Erwin* before adjudicating the common law claims remaining in this case, and (2) we find further airing of the matter in this court unwarranted. Accordingly, the petition for rehearing is

*Denied.*